434 A.2d 106

**Edmund DAWEJKO and Roseann Dawejko**

v.

**JORGENSEN STEEL COMPANY, Fred Hill & Son Company, Dresser Industries, Inc., American Chain and Cable Company, Inc., a/k/a ACCO, and Mansaver Industries, Inc., a Division of ACCO.**

**Appeal of AMERICAN CHAIN AND CABLE COMPANY, INC., a/k/a ACCO, and Mansaver Industries, Inc., a Division of ACCO.**

Superior Court of Pennsylvania.

Argued Dec. 2, 1980.

Filed Aug. 14, 1981.

16

Charles W. Craven, Philadelphia, for appellants.

Robert M. Ross, Philadelphia, for appellees.

Before SPAETH, BROSKY and HOFFMAN, JJ.

SPAETH, Judge:

Appellee Edmund Dawejko was injured on August 2, 1972, when he was struck by sheets of steel that were accidentally

dropped from a lifting machine called a "Mansaver." The "Mansaver" was manufactured by Mansaver Industries, Inc., of New Haven, Connecticut, in 1957 and was sold, through a broker, to Hotpack Corporation, appellee's employer. In 1964, Mansaver Industries, Inc., sold its assets to American Chain and Cable Company, also known as ACCO, and subsequently ceased operations. ACCO formed a subdivision called Mansaver Industries, Inc., a Division of ACCO. The issue we must decide is whether appellees may recover against ACCO on principles of strict tort liability. We hold that they may recover.

–1–

■ The general rule is that when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets. *Husak v. Berkel Incorporated,* 234 Pa.Super. 452, 341 A.2d 174 (1975). *See also Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3d Cir. 1974) *cert. denied, North American Rockwell Corp. v. Knapp,* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975). However, there are several exceptions to this general rule:

> In order to find that this general rule is not applicable and that the transferee does acquire such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability. *See Granthum v. Textile Machine Works,* 230 Pa.Super. 199, 326 A.2d 449 (1974). A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for creditors of the transferor. *See Lopata v. Bemis Co., Inc.,* 383 F.Supp. 342 (E.D.Pa.1974); *McKee v. Harris-Seybold Co., Division of Harris-Intertype Corp.,* 109 N.J.Super. 555, 264 A.2d 98 (1970); 19 Am.Jur.2d *Corporations* § 1546

(1965); 15 W. Fletcher, *Cyclopedia of Corporations* § 7122 (Perm. ed. 1973).

*Husak v. Berkel Incorporated, supra*, 234 Pa.Super. at 456–57, 341 A.2d at 176–77.

*See also Caberera v. Hayes-Albion Corp.*, C.A. No. 80–3108 (E.D.Pa. Feb. 10, 1981); *Woody v. Combustion Engineering, Inc.*, 463 F.Supp. 817, 820 (E.D.Tenn.1978).

Sometimes in cases of strict tort liability the general rule seems to lead to an unjust result. consequently, a tendency has developed either to expand one of the recognized exceptions to the rule or to add a new exception, so that the successor corporation will be strictly liable for a defective product manufactured by the predecessor corporation.

Traditionally, a case has been held within the "continuation" exception only when there is a common identity of officers, directors and stock between the selling and purchasing corporations, and only one corporation after the transfer. *See Jacobs v. Lakewood Aircraft Service, Inc., et al.*, F.2d (3d Cir., filed April 3, 1981); *Lopata v. Bemis Co.*, 383 F.Supp., 342 (E.D.Pa.1974), *vac. and remanded*, 517 F.2d 1398 (3d Cir.), *judgment reinstated*, 406 F.Supp. 521 (E.D.Pa. 1975); *Kloberdanz v. Joy Manufacturing Co.*, 288 F.Supp. 817, 821 (D.Colo.1968); *Wilson v. Fare Well Corp.*, 140 N.J. Super. 476, 356 A.2d 458 (L.Div.1976). However, in some recent decisions, a "continuation" has been defined more broadly, the emphasis being shifted from corporate formalities to an inquiry regarding the nature of the business operations.

In *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974), several employees and a financial backer had purchased the assets of a predecessor corporation after its owner died. According to the court this was a transfer in which "facial and substantive continuity were the essence of the bargain." 501 F.2d at 1152.

The purchase of good will and contract obligations was central to the agreement. Old service obligations were assumed by the purchaser and B. Offen & Co., Inc. [successor] continued to service and renovate old dryers. No

> notice was given to known customers of B. Offen Company [predecessor] that a new or different business was beginning. B. Offen & Co., Inc. advertised itself as an ongoing enterprise, and even claimed in its advertising that it was a forty year old business. It continued to produce the same kind of product in essentially the same way that Bernard Offen [owner of predecessor] had. 501 F.2d at 1151.

In these circumstances, the Court of Appeals, applying New Hampshire Law, found a continuation and therefore held that the successor corporation was not immune from suit. The court based its decision on the considerations of policy that underlie the rule of strict liability:

> The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiation, and is the only entity capable of improving the quality of the product. 501 F.2d at 1154.

The court said that

> it is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from and exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment. 501 F.2d at 1154.

In *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the successor corporation maintained the

same product, name, personnel, property and clients. According to the court, "[C]ontinuity [was] the purpose, continuity [was] the watchword, continuity [was] the fact." *Id.* at 426, 244 N.W.2d at 882. The court defined "continuity of the enterprise" as existing when there is continuity of the predecessor corporation's enterprise (management, personnel, physical location, assets, etc.), and when, after the transaction, the predecessor corporation ceases its ordinary business operations, while the successor corporation continues those operations. In these circumstances, the court said, liability should extend to the successor corporation. "[J]ustice would be offended if a corporation which holds itself out as a particular company for the purpose of sales would not be estopped from denying that it is that company for the purpose of determining products liability." 397 Mich. at 426, 244 N.W. at 882. For other opinions adopting this concept of "continuity of the enterprise," *see Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781, 785 (Ala.1979), and *Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136 (E.D.Mich.1979).

Some of the cases have taken a slightly different tack. Instead of deciding whether a given case fits within the continuation exception to the general rule, they have evolved a new exception, which may be called the product-line exception. *See* Recent Developments, *Products Liability-Liability of Transferee for Defective Products Manufactured by Transferor*, 30 Vanderbilt L.R. 238 (1977); Recent Developments, *Products Liability-Corporations—Asset Sales and Successor Liability*, 44 Tenn.L.R. 905 (1977).

In *Ray v. Alad Corporation*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), the successor corporation continued to manufacture the predecessor corporation's product line (ladders), using the same equipment and designs, employing the same personnel, and soliciting the predecessor's customers through the same sales representatives, with no outward indication of a change of ownership. The court held that the continuation exception was not available because under California law it was limited to cases in which there was inadequate consideration for the predecessor corporation's

assets and no provision for meeting the claims of unsecured creditors, or where one or more persons were officers, directors or stockholders of both corporations. The court was of the opinion, however, that to deny recovery simply because there was no continuation would be unjust:

> The purpose of the rule of strict tort liability "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901.) However, the rule "does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that '[t]he cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' (*Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 462, 150 P.2d 436 [concurring opinion].)" (*Seeley v. White Motor Co.*, (1965) 63 Cal.2d 9, 18–19, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151.) Thus, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the *spreading throughout society* of the cost of compensating them." (Italics added.) *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 251, 85 Cal.Rptr. 178, 181, 466 P.2d 722, 725.) 19 Cal.3d at 30–31, 136 Cal.Rptr. at 579, 560 P.2d at 8–9.

Given this "paramount policy," the court held, strict liability should be imposed upon a successor to a manufacturer if three circumstances were shown:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden

necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Id.*

The court then examined the facts of the case before it, concluded that the three circumstances were shown, and reversed a summary judgment that had been entered in favor of the successor corporation.

■ In *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981), the court, after a review of the cases, including *Ray v. Alad Corp., supra, Turner v. Bituminous Casualty Co., supra, Cyr v. B. Offen & Co., Inc. supra,* decided to adopt the product-line exception, which it formulated as follows:

[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

86 N.J. at 358, 431 A.2d at 825.

–2–

So far, Pennsylvania law has not adopted the product-line exception. In *Jacobs v. Lakewood Aircraft Service, Inc. supra,* Chief Judge LORD of the Federal District Court had occasion to consider a successor corporation's liability in a products liability case. As it happened, however, he did not have to decide just what was Pennsylvania law. He assumed that a Pennsylvania court would define a "continuation" more broadly than has been traditional, and also, would adopt the product-line exception. He found, however, that even on this assumption, the facts before him could not justify a finding of liability. We believe that it is now time to adopt the product-line exception as Pennsylvania law. Doing so represents a natural development of the law, which in fact has been foretold.

In *Knapp v. North Americal Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974), the Court of Appeals had to decide whether under Pennsylvania law summary judgment should have been granted in favor of a successor corporation. The court acknowledged that in form the transaction between the predecessor corporation and the successor corporation was a sale of assets rather than a merger, and that, therefore, liability could not be imposed under the merger exception to the general rule that a sale of corporate property by one company to another does not carry liability with it. Nevertheless, the court reversed. It based this decision on the conclusion that a Pennsylvania appellate court would hold that the particular facts of the transaction were such that it "should be treated as a merger." *Id.* at 367. The predecessor corporation had exchanged substantially all of its assets for stock in the successor corporation, and although it did not terminate its existence for eighteen months after the exchange, the contract forbid it to engage in normal business transactions and required that it dissolve as soon as practicable. Also, the contract required the predecessor corporation to preserve its business organization intact for the successor corporation, to make available to the successor its existing officers and employees, and to maintain its relationship with its customers and suppliers. After the exchange of assets for stock, the successor corporation continued the predecessor corporation's business operations. Given these facts, the court, by Judge ADAMS, said:

> If we are to follow the philosophy of the Pennsylvania courts that questions of an injured party's right to seek recovery are to be resolved by an analysis of public policy considerations rather than by a mere procrustean application of formalities, we must, in considering whether the ... exchange was a merger, evaluate the public policy implications of that determination.
>
> *Id.* at 369.

In concluding that public policy considerations required that a merger be found—that liability be imposed—the court relied particularly on *Ayala v. Phila. Bd. of Educ.*, 453 Pa.

584, 305 A.2d 877 (1973), where the Supreme Court abolished the doctrine of local governmental immunity, with the observation that "[t]he city is a far better loss-distributing agency than the innocent and injured" student whose arm was hurt in a shredding machine during an upholstering class. 453 Pa. at 594–95, 305 A.2d at 882, *quoting from* 32 Am. Trial L.J. 284, 288 (1968).

Judge ROSENN concurred in this result, but he concluded that liability should be imposed on the successor corporation on the basis of a liberal construction of the merger provisions of the Business Corporation Law. After stating that "[i]n the present day of complex corporate reorganizations and acquisitions," courts "must examine the substance of a transaction [rather than merely the form] to ascertain its true purpose and intent," 506 F.2d at 370, Judge ROSENN said:

> I believe that, where a corporation purchases substantially all the assets of a second corporation, the legislature intended to impose the second corporation's tort liabilities on the acquiring corporation at least if the following attributes of merger are present:
>
> (1) an ongoing business, including its name and good will, is transferred to the acquiring corporation; and
>
> (2) the corporation whose assets are acquired is dissolved after distribution to its shareholders of the consideration received from the acquiring corporation.

Judge ROSENN concluded by saying:

> In imposing liability for the torts of the acquired corporation, I realize that the acquiring corporation was not a party to any tortious act and had no connection with the acquired corporation at the time the allegedly defective product was manufactured. The acquiring corporation, however, is in a position both before and after the acquisition to take necessary measures for its protection against potential products liability claims.

*Id.* at 373.

It is perhaps only a matter of style how one proceeds. One may retain the traditional exceptions but expand their

boundaries, so that "merger" or "continuation" are held to include cases they once would not have included. Or one may adopt a new exception, such as the product-line exception. We believe it better to adopt a new exception. To the extent the law has changed—and so far, as the foregoing discussions indicates, it has changed in relatively few jurisdictions—the change may be explained as an attempt to implement "the social policies underlying strict products liability." *Ramirez v. Amsted Industries, Inc. supra* at 358, 431 A.2d at 825. By adopting a new exception, this impetus is acknowledged and made plain, the other exceptions then remaining, to deal with cases not so much affected by the policy considerations that have led to the rule of strict liability for defective products.

We also believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in the several cases discussed above will always be pertinent— for example, whether the successor corporation advertised itself as an ongoing enterprise, *Cyr v. B. Offen & Co., supra*; or whether it maintained the same product, name, personnel, property, and clients, *Turner v. Bituminous Casualty Co., supra*; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve, *Knapp v. North American Rockwell Corp., supra.* Also, it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp., supra*, has been met. The exception will more likely realize its reason for being, however, if such details are not made part of its formulation. The formulation of the court in *Ramirez v. Amsted Industries, Inc., supra,* is well-put, and we adopt it.

–3–

 If one applies the product-line exception as formulated in *Ramirez v. Amsted Industries, Inc., supra,* to the

facts of the present case, one will conclude that the decision of the lower court should be affirmed. Appellant seeks judgment n.o.v. In deciding whether judgment n.o.v. should be entered, we must view all of the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner. *Handfinger v. Philadelphia Gas Works*, 439 Pa. 130, 266 A.2d 769 (1970); *Visscher v. O'Brien*, 274 Pa.Super. 375, 418 A.2d 454 (1980). Viewed in this light, the record shows the following facts: After transferring its assets to ACCO, in 1964, Mansaver Industries, Inc., of New Haven, Connecticut, went out of business. (R.R. 21a). The assets transferred included Mansaver's trademark and good will. (R.R. 20a). The record includes a four page manual regarding the "Mansaver standard headroom sheet lifter (hand-operated)." (R.R. 51a–54a). This was issued October 1, 1974, and was revised September 27, 1976. (R.R. 51–54a). It bears the name "ACCO—Industrial Lifters Division" on three of its pages (R.R. 51a, 52a, 54a); the third page, "Operating Instructions," is evidently carried over from the original manual, for it is identified as from "New Haven, Connecticut." (R.R. 53a). In their brief, appellees say:

We suggest this is clear evidence that not only did [appellant] purchase the assets of Mansaver Industries, Inc. of New Haven, Conn., but it continued to operate the business [,] manufacturing and selling the identified product as its assignor corporation had done . . . [I]n acquiring the goodwill of Mansaver Industries, Inc. of New Haven, Conn., [appellant] clearly evinced the intention to continue the business as it had existed. Why else would [appellant] expressly desire to acquire its predecessor's good will . . . [?] That course of action shows a desire to capitalize of the past performance and business carried on by the old corporation. Indeed, [appellant's] course of operations following the acquisition of assets indicates that [appellant] manufactured and sold the same machine under the same name as its predecessor.

Brief for appellees at 9–10.

28

While we do not agree that the record is as "clear" or complete as it might have been, nevertheless, the jury was entitled to find the facts as appellees have stated them.[1]

Affirmed.

1. Appellant also argues that the lower court erred in considering its motion for judgment n.o.v. as though it were a motion for summary judgment. We agree that the lower court applied an erroneous standard in considering appellant's motion, but find the error harmless, given our disposition above.

On another procedural point, appellee argues that the lower court was correct in dismissing appellant's motion for judgment n.o.v. for failure of appellant to comply with 12 P.S. § 681, Act of April 22, 1905, P.L. 286 § 1, as amended, 12 P.S. § 681, repealed, Act of April 28, 1978, P.L. 202, § 2(a) (effective June 27, 1980), which provides that the party moving for judgment n.o.v. is required to "move the court to have all the evidence taken upon the trial duly certified and filed so as to become part of the record." We have concluded that in the particular circumstance of this case—which we think it unnecessary to state—the lower court should not have dismissed appellant's motion for judgment n.o.v. solely for failure of appellant to have the notes of testimony transcribed. However, we find this error to have been harmless, given our conclusion that judgment n.o.v. was correctly denied on substantive grounds.