**Sidney TURNER**

v.

**MUDRICK MACHINE WORKS, B & M Machine Works, Inc. Alpha-Omega, Inc. Crompton & Knowles Corporation, James Hunter Machine Company.**

Civ. A. No. 82–4565.

United States District Court, E.D. Pennsylvania.

July 20, 1984.

Lawrence R. Cohan, Alan Schwartz, Anapol, Schwartz, Weiss & Schwartz, Philadelphia, Pa., for plaintiff.

John P. Penders, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for defendant B & M Machine Works, Inc.

John F. Naulty, John M. McNally, Jr., Naulty, Scaricamazza & McDevitt, Philadelphia, Pa., for defendant Crompton & Knowles Corp.

## OPINION

LUONGO, Chief Judge.

This is an action for personal injuries brought against several defendants allegedly involved with the manufacture or sale of a machine referred to as a "Mudrick Picker." On March 11, 1983, defendant B & M Machine Works, Inc. (B & M) filed a motion for summary judgment on the ground that it was not a successor corporation to the manufacturer of the machine, and that it was not otherwise sufficiently affiliated with the manufacturer or its successors that it could be held accountable for plaintiff's injuries. B & M's motion was opposed as premature by plaintiff and the other defendants, who also claimed that the discovery completed at that time failed to establish the absence of genuine issues of material fact. I postponed consideration of B & M's motion, and granted the parties until August 31, 1983 to complete discovery

bearing upon the motion.[1] After a further exchange of correspondence, I again deferred ruling upon B & M's motion in order to afford the parties additional time for discovery. Since then, B & M's answers to plaintiff's second set of interrogatories have been made part of the record, plaintiff's counsel has notified the court that he will offer no additional evidence in opposition to B & M's motion, and no other defendant has added to the record. I conclude that the motion is now ripe for resolution, and, for the reasons discussed below, I will grant it.

### Background

The gravamen of plaintiff's complaint is that he was injured during the course of his employment by a defective Mudrick Picker, model Md–2140, serial number 833.[2] It is agreed by the parties that the machine in question was manufactured by Mudrick Machine Works, and sold to plaintiff's employer, General Felt Industries, during February of 1957. The dispositive question on this motion centers on the relationship between defendant B & M and the manufacturer and its successors in interest.

Plaintiff maintains that B & M either became a successor to Mudrick Machine Works, or assumed the manufacturer's liabilities. In support of that argument, plaintiff sketches the following chain of ownership of Mudrick Machine's assets through 1973: He asserts that in 1961, Mudrick sold its "entire California manufacturing operation, including the relevant picker line, to James Hunter Machine Company;"[3] that James Hunter Machine Company continued to operate Mudrick's manufacturing plant; that, later in 1961, James Hunter Machine Company sold its "entire California operation to Defendant, Crompton & Knowles Corporation;" that Crompton & Knowles assumed the liabilities of James Hunter Machine Company, and continued operating the facility under Hunter's name; and that between 1971 and 1973, the "original Mudrick manufacturing facilities" were sold in part to B & M, and the remainder to the James Hunter Machine Company.

The crucial transactions, continues plaintiff, were Crompton & Knowles' sales in 1971 to B & M, and to James Hunter Machine Company in 1973. With respect to the sale to B & M, plaintiff contends that B & M purchased sufficient manufacturing assets from Crompton & Knowles to continue manufacturing pickers such as the one that injured plaintiff, and, indeed, that B & M committed itself to producing such devices until Crompton & Knowles' James Hunter division was able to establish manufacturing facilities in Massachusetts. With regard to the sale to James Hunter Machine Company, plaintiff asserts that a material question of fact remains because it is uncertain whether Hunter ever resumed manufacture of the line of machines at issue in this suit.[4]

### The Contentions

Based on this scenario as supplemented by B & M's recently filed answers to interrogatories, the parties dispute whether

---

**1.** Discovery in this case has been delayed significantly by problems arising out of James Hunter Machine Company's petition for relief in the United States Bankruptcy Court for the District of Massachusetts.

**2.** Complaint ¶ 10. At oral argument, counsel advised the court that the machine involved in this case is a "shredder," not a "picker."

**3.** Plaintiff's Memorandum of Law at 2.

**4.** Defendant B & M recites a somewhat different chain of custody of Mudrick Machine Company's original assets. B & M states that the James Hunter Machine Company, upon its 1961 purchase of Mudrick, changed the Mudrick name to the Hunter Fiber Machine Company, and continued operation of the Mudrick plant; that in 1963 Crompton & Knowles acquired (apparently the entire) James Hunter Machine Company and constructed new manufacturing facilities at Gardenia, California; that in 1970 Crompton & Knowles "closed its West Coast Manufacturing facilities and sold the Gardenia, California real property; and that the 1971 sale of assets to B & M was conducted by the "James Hunter Machine Company, Division of Crompton & Knowles." B & M's Memorandum of Law, at 1–3. I need not resolve these differences to decide B & M's motion.

there remain genuine issues of material fact as to B & M's relationship to Mudrick Machine Works' apparent successors. In support of its motion for summary judgment, B & M argues that neither the traditional theories for imposition of successor liability nor the recently adopted "product line exception" render it subject to liability based upon plaintiff's allegations. The traditional theories are inoperative, B & M argues, because its purchase of assets from Crompton & Knowles did not amount to a consolidation, merger, or continuation of the seller; because the sale was not effected to escape liability; and because B & M did not agree to assume the liabilities of the selling corporation. Plaintiff's claim under the product line exception fails, according to B & M, because B & M's purchase of assets from Crompton & Knowles' James Hunter division contemplated that the Hunter division, and not B & M, would continue to manufacture equipment of the type that injured plaintiff, because B & M did not purchase the assets or inventory used in the manufacture of machines of the type that caused plaintiff's injury, because B & M did not purchase the name or goodwill of the seller, and because B & M did not purchase all or substantially all of the seller's manufacturing assets.

In response, plaintiff argues only that B & M has failed to establish the inapplicability of the product line exception. To buttress that claim, plaintiff points to the initial agreement between B & M and the James Hunter division which required B & M to produce "MC type pickers" until Crompton & Knowles relocated the James Hunter division in Massachusetts. That agreement, plaintiff contends, viewed in light of B & M's purchase in 1972 of additional inventory from the James Hunter division in Los Angeles, compels the conclusion that B & M purchased sufficient assets to continue the manufacture of the Mudrick picker. Plaintiff further claims that the 1973 sale of the James Hunter division's manufacturing operation to the James Hunter Machine Company raises questions as to whether the latter ever resumed operations and whether B & M

ever ceased manufacture of the allegedly defective machine.

Moreover, plaintiff contends that B & M's capacity, and at least temporary obligation, to manufacture the Mudrick picker product line, when considered in light of the uncertain volume of assets transferred to James Hunter Machine Company (and the uncertainty as to how those assets were used), leaves open the possibility that B & M became Crompton & Knowles' successor with respect to the allegedly defective product. Phrased differently, plaintiff argues that the current record does not foreclose the possibility that Crompton & Knowles sold all or substantially all of its assets for production of the product line to B & M.

Plaintiff also disputes B & M's contention that it never produced a picker of the type involved in plaintiff's accident. In this regard, plaintiff notes that B & M retained the right, under its contract with the James Hunter division, to manufacture an "F–6" picker, a device not distinguished on the record as it stood when plaintiff's memorandum was filed from the "M–2" type machine involved in plaintiff's accident. Plaintiff's Memorandum of Law at 5, n. 1. And finally, in a status report submitted before argument on these motions, plaintiff asserts that B & M has admitted that it acted as the James Hunter division's "West coast representative for sales and service" after April 28, 1972.

### Discussion

■ Out of an abundance of caution, I have delayed ruling upon defendant B & M's motion for summary judgment, principally because of the substantial discovery problems encountered by plaintiff's counsel. However, after consideration of B & M's recently filed answers to plaintiff's interrogatories and the failure of any party to come forward with contradictory materials, I conclude that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Reduced to its essence, the current record

conclusively demonstrates that B & M did not purchase all or substantially all of the manufacturing assets of any predecessor legally responsible for plaintiff's injuries, and that it did not hold itself out to the public as the continuation of any liable transferor. Furthermore, B & M did not undertake to manufacture the product line which encompassed the machine involved in this case. Under these circumstances, it is abundantly clear that the product line exception to the traditional restriction of corporate successor liability cannot apply.

The general principle regarding the liability of corporations that acquire assets of other corporations, of course, "is that 'a mere sale of corporate property by one company to another does not make the purchaser liable for the liabilities of the seller not assumed by it.' " *Knapp v. North American Rockwell Corporation*, 506 F.2d 361, 363 (3d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), *quoting, Shane v. Hobam, Inc.*, 332 F.Supp. 526, 527 (E.D.Pa. 1971) (citation omitted, applying New York law). Traditional exceptions to the rule charge the buyer with its transferor's obligations

> when (1) the purchaser expressly or impliedly agrees to assume such obligations; (2) the transaction amounts to a consolidation or merger of the selling corporation with or into the purchasing corporation; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for such obligations.

*Knapp*, at 363–364, *quoting, Shane v. Hobam, Inc.*, 332 F.Supp. at 527–528 (citation omitted).

In recent years, an additional exception has been fashioned to impose successor liability on corporations that purchase the assets of a predecessor and continue to manufacture a product line previously made by the transferor. Under the product line exception

> where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 358, 431 A.2d 811, 825 (1981). The Pennsylvania Superior Court adopted the product line exception in *Dawejko v. Jorgensen Steel Company*, 290 Pa.Super.Ct. 15, 434 A.2d 106 (1981).[5] In so ruling, the Superior Court formulated a flexible test for determining whether the exception should apply in any given case. The court stated:

> We ... believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in the several cases discussed above will always be pertinent—for example, whether the successor corporation advertised itself as an ongoing enterprise, *Cyr v. B. Offen & Co.*, [501 F.2d 1145 (1st Cir.1974)]; or whether it maintained the same product, name, personnel, property, and clients, *Turner v. Bituminous Casualty Co.*, [397 Mich. 406, 244 N.W.2d 873 (1976)]; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve, *Knapp v. North American Rockwell Corp., supra.* Also, it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp.*, [19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)], has been met. The exception will more likely realize its reason for

---

5. I will assume, for purposes of this motion, that the Pennsylvania Supreme Court will concur with the Superior Court's holding.

being, however, if such details are not made part of its formulation. The formulation of the court in *Ramirez v. Amsted Industries, Inc., supra,* is well-put, and we adopt it.

290 Pa.Super.Ct. at 26, 434 A.2d at 111.

The Superior Court's adoption of the product line exception and its rejection of a mechanistic statement of criteria for its application did not, however, herald abandonment of the general rule. The product line exception has limitations that are well illustrated by the facts of this case.

■ Initially, B & M's conduct fails to manifest indicia of continuing corporate identity with legally liable transferors. An uncontradicted affidavit submitted in support of B & M's motion establishes that B & M did not purchase the goodwill or corporate name of its transferors, and that B & M's agreements with the James Hunter Machine Company did not include purchases of the latter's bank accounts, accounts receivable, or customer lists. Thus, it cannot be said that B & M purposefully availed itself of the benefits of a public perception of corporate continuity.[6]

■ Moreover, the amount and nature of assets purchased by B & M from transferees of original Mudrick assets fall far short of that quantity required to justify attachment of successor liability. B & M's agreement with James Hunter did not include transfer of real estate, manufacturing equipment or facilities, or substantial quantities of inventory. Rather the purchases, though not insignificant, included relatively minor transfers of machine tools, vehicles, and replacement parts for previously manufactured machines. This is simply not the type of capital transfer sufficient under the product line exception to shift to the purchaser the economic risk for personal injuries caused by the seller's products.

■ Finally, B & M's recently filed answers to interrogatories establish that B & M did not carry on a product line which included machines of the sort involved in this litigation. Although, as plaintiff contends, the record in existence when B & M filed its motion did not differentiate between the industrial machinery made by B & M and the product at issue here, it is now clear that the machine alleged to have caused plaintiff's injuries was a "shredder," and that B & M manufactures "pickers." The difference, as explained in B & M's answers to interrogatories, is as follows:

> The cylinders of a "shredder" each carry many small teeth which tear the scraps to accomplish the shredding. Its purpose is to shred scrap carpet, burlap and other scrap textile material so that the output of the "shredder" may be further processed by other machinery to ultimately produce carpet underlay.

> A "picker" such as the F-6 model is utilized in fluffing and cleaning cotton linters and gin flues only. The ultimate product is the soft cotton batt used in the manufacture of mattresses. The rotating shaft of the "picker" carries several long bars for tumbling and cleaning material.

Answer of Defendant B & M Machine Works, Inc. to Plaintiff's Second Set of Interrogatories # 30.

B & M did not manufacture "shredders," and within the genre of industrial machinery, "pickers" and "shredders" appear to be sufficiently dissimilar that they should be considered separate product lines.

---

**6.** Indeed, the manufacturer from which B & M purchased assets—James Hunter—remained an independent business after the sale, and James Hunter retained the exclusive right to produce "shredders." In light of my disposition of this motion and B & M's concession that liability would attach had I resolved differently the factors herein ennumerated, I have no occasion to examine application of the product line exception to purchasers from corporations that remain viable business entities. *Compare Amader v. Pittsburgh Corning Corporation,* 546 F.Supp. 1033, 1036 (E.D.Pa.1982) (applying product line exception to Pittsburgh Corning Corporation because of its purchase of the Unibestos product line from Unarco Industries, Inc.) *with Reed v. Armstrong Cork Co.,* 577 F.Supp. 246, 251 (E.D. Ark.1983) (assuming that Pennsylvania law applied, reaching contrary conclusion).

In short, after consideration of the facts of this case in light of the factors ennumerated in the *Dawejko* opinion, I conclude that application of the product line exception to defendant B & M would be unjust. Neither the economic transactions between B & M and the transferees of original Mudrick assets, nor the conduct of B & M since those transfers, provides a fair basis for imposition of successor liability. B & M's motion for summary judgment will therefore be granted.

**Sharon CRUZ, Special Administrator of the Estate of Jose M. Cruz, Deceased, for her use and the use of Edwin Lee Cruz and Joseph Cruz, Plaintiffs,**

v.

**TEXACO, INC., a corporation, Defendant Third Party Plaintiff,**

v.

**SIMPSON OIL COMPANY, Third Party Defendant.**

**Civ. No. 82–3061.**

United States District Court, S.D. Illinois, E. St. Louis Division.

July 20, 1984.

William D. Hanagan, Hanagan & Dousman, P.C., Mount Vernon, Ill., for plaintiffs.

Larry E. Hepler, Burroughs, Simpson, Wilson, Hepler, Broom & McCarthy, Edwardsville, Ill., Jack M. Short, Tulsa, Okl., for defendant Texaco.

Robert W. Cadagin, Cadagin, Cain & Tognarelli, Collinsville, Ill., for Simpson Oil.

### MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

Before the Court is a Motion for Summary Judgment filed by defendant Texaco on

June 20, 1984. In effect, defendant Texaco moves the Court to reconsider a portion of an Order of Senior Judge William G. Juergens filed August 31, 1983, in which he denied defendant Texaco's Motion for Summary Judgment as to Count 2 of the Complaint.

Jose M. Cruz was killed while driving a winch truck to transport a piece of oil field equipment known as a gear box with counterweights. The gear box and counterweights came loose from the rear end of the winch truck and swung from side to side. As a result, the winch truck left the road and turned over, resulting in the death of Jose Cruz. Texaco sold the winch truck to Simpson Oil Company on June 3, 1980. In Count 2, plaintiffs allege Texaco negligently failed to warn the deceased that the winch truck should not be used at highway speeds when heavy objects are suspended at the rear of the truck. Texaco moves for judgment in its favor arguing (1) Texaco did not have a duty to warn the deceased because the alleged dangerous condition was understood by, and obvious to, the deceased's employer; and (2) Texaco is not liable to plaintiffs because the truck was sold to Simpson Oil Company on an "as-is" basis.

## I

While there is no doubt that liability can be imposed in Illinois under a negligence theory for failure to warn, *Kirby v. General Paving Co.*, 86 Ill.App.2d, 453, 229 N.E.2d 777 (4th Dist.1967), the scope of the duty has not been adequately defined. *See Manning v. Ashland Oil Co.*, 721 F.2d 192, 193 (7th Cir.1983). For an analytical framework, Illinois courts have adopted Section 388 of the Restatement (Second) of Torts:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for use it is supplied if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and

(c) fails to exercise reasonable care to inform them of its dangerous condition or the facts which make it likely to be dangerous.

*See Baylie v. Swift & Company*, 27 Ill. App.3d 1031, 327 N.E.2d 438, 447 (1st Dist. 1975). Both parties find solace in this language. Texaco argues plaintiffs have not satisfied subpart (b) since Texaco had every reason to believe the decedent would realize the dangerous condition because the decedent's employer realized the danger. Plaintiffs point out § 388 specifically refers to those who "use" a chattel and not to those who purchase the item.

Cases construing § 388 have held that a manufacturer or a supplier need not warn the ultimate user in every case that a duty to warn is present. For instance, in *Jacobson v. Colorado Fuel and Iron Corporation*, 409 F.2d 1263 (9th Cir.1969), plaintiff's decedent was killed when a steel strand manufactured by defendant broke, and plaintiff contended the decedent was inadequately warned of the danger of overstressing the strand. In *Jacobson*, the decedent was a foreman who performed his job under the direction of superiors. One of those superiors, the production manager, admitted knowledge of the danger. The Court held:

Decedent's employer and its supervising personnel should have known and actually did know the dangers inherent in the *use* of defendant's product in the hold-down device. Any breach of duty owed to the decedent with the resultant strict tort liability, if any, was the liability of decedent's employer and supervising personnel and not the liability of defendant....

There is no duty to warn those who simply follow the directions of the engi-

neers or technicians, or to put it differently, there is no duty of a supplier of chattel to foresee that the engineers or technicians will fail to follow warnings given or to employ knowledge possessed. *Id.* at 1272–73.

Courts have focused on the use of the product that caused the injury when determining whether a warning to an employer or other third party is sufficient to insulate a supplier from liability for an injury to a user of the product. As illustrated in *Jacobson*, when the employer or third party is directing the use of the product, a warning to the employer has been sufficient. For example, in *Hopkins v. E.I. Dupont*, 212 F.2d 623 (3rd Cir.), *cert. denied*, 348 U.S. 872, 75 S.Ct. 108, 99 L.Ed. 686 (1954), the Court held the manufacturer of dynamite did not have a duty to warn an employee about potential danger in the use of dynamite where blasting operations were supervised by foremen who knew of the danger. *See also Marker v. Universal Oil Company*, 250 F.2d 603 (10th Cir.1957). However, when a product is supplied directly to the user, and it is used without direction or supervision, courts have required the supplier to attach a warning on the product itself. For instance, in *Jackson v. Coast Paint and Lacquer Company*, 499 F.2d 809, 812–814 (9th Cir.1974), the court imposed on the paint manufacturer the duty to warn the ultimate user of potential dangers in the use of the paint. The court reasoned that the act of opening and using paint is not usually directed by an employer or supervisor. Thus, the fact that the painting contractor may have known of the danger was irrelevant to the court. The *Jackson* court relied heavily on *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 130–31 (9th Cir.1968) where the court held that in a case of a prescription drug, normally a warning to the physician is sufficient. However, if the drug is distributed without the intervening supervision of a physician, a direct warning to the patient was required.

## II

