CATASAUQUA AREA
SCHOOL DISTRICT

v.

RAYMARK INDUSTRIES, INC., et al.

Civ. A. No. 85–3743.

United States District Court,
E.D. Pennsylvania.

May 15, 1987.

Norman Perlberger, Philadelphia, Pa., for plaintiff.

John Patrick Kelley, Philadelphia, Pa., for Owens-Corning Fiberglas Corp.

F. James Gallo, Philadelphia, Pa., for U.S. Mineral Products Co.

Wilson M. Brown, III, Philadelphia, Pa., for Aeroquip Corp.

Warren L. Simpson, Philadelphia, Pa., for W.R. Grace & Co.

Arthur Makadon, Philadelphia, Pa., for Raymark Industries, Inc.

Charles J. Tague, Jr., Bryn Mawr, Pa., for Babcock and Wilcox Co.

John F. Ledwith, Philadelphia, Pa., for Keene Corp.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiff, Catasauqua Area School District, initiated this action on June 28, 1985, seeking recovery from various defendants for damages incurred by the abatement of asbestos-containing products from buildings within plaintiff's school district. Other defendants were added through consolidation with a later action in March, 1986.[1] Judgment has been entered, by previous orders, in favor of most defendants and presently, the following defendants remain in this action: Pfizer, Inc., Basic, Inc., Combustion Engineering, Inc., Eagle-Picher Industries Inc., and Bird, Inc. Plaintiff claims that each of these defendants is liable to it either directly, or indirectly based on theories of corporate successor liability. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief for future medical monitoring expenses for its employees.

Presently pending are the following motions: Bird's motion for summary judgment; Pfizer's motion for summary judgment; and joint motions of various defendants for summary judgment on the issues of punitive damages and medical monitoring. These motions are discussed in turn below.

### I. *Summary Judgment Standard*

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not rule on questions of disputed fact, but simply decides whether there is a genuine issue of material fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The facts and inferences therefrom must be viewed in the light most favorable to the opposing party, and any reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance*

*Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir. 1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, 106 S.Ct. at 2511.

### II. *Bird's Motion for Summary Judgment*

█ Plaintiff claims that asbestos-containing roofing felts manufactured by Bird & Son, Bird's predecessor, were installed in Catasauqua High School during its construction. In its motion for summary judgment, Bird argues, *inter alia*, that there is no evidence that any Bird product was present in the high school. Because I agree, I must grant Bird's motion.

In support of its claim, plaintiff relies primarily on a materials list of products approved for installation into the high school (Bird's motion for summary judgment, Ex. D). The list includes a product called "#15 Saturated Asbestos Felt" manufactured by Bird & Son. This list, however, shows only what products were approved for installation—it does not show what products were actually installed. (Busch dep. at 167).

To establish that Bird asbestos felts were placed in the high school's roof, plaintiff relies on the testimony of Gerald A. Busch, a partner in Seibert & Busch, the successor firm to the architecture firm that designed Catasauqua High School. Busch, who worked as a draftsman on the plans for the high school, testified initially that the products on the materials list had to be the products actually used in the construction of the school because they were approved for installation. (Busch dep. at 166). However, Busch later conceded that the list does not show that the products were actually installed, and further testified that school districts often hired employees known as "Clerks of the Works" to ensure that the products on the materials list were actually installed in the building. (Busch dep. at 167–68). Plaintiff also relies

---

**1.** See *Catasauqua Area School District v. Raymark Industries, Inc.,* No. 85–3743 (E.D.Pa. Mar. 27, 1986) (order consolidating 85–3743 and 86–1270).

on Busch's testimony that if a product on the materials list was changed, a revised materials list should exist which would reflect that change. (Busch dep. at 167). Busch based his testimony, however, on how a project would be handled if he were the architect; in this case, Busch was a draftsman, not the architect. In sum, a review of Busch's testimony shows that he has no actual knowledge of the products installed, and his testimony concerning the significance of the materials list in this case is speculation.

Except for Busch's testimony and the materials list, plaintiff has no evidence that the Bird asbestos roof felts were actually installed in the building. Plaintiff has done no testing on the roof to determine what products are present. (Bird's Ex. E & F No. 6). Nor has plaintiff identified nor deposed the Clerks of the Works, the individuals with the knowledge of which products were installed in the building.

In contrast, Bird has submitted affidavits of Thomas J. Harnett, an employee of Bird since 1960, and currently the Director of Field Sales. Harnett states that he is knowledgeable about Bird's customers and the distribution of Bird's products, and that Bird has no records or knowledge reflecting that any product of Bird or its predecessor was sold directly to plaintiff or to any sub-contractor or contractor identified by plaintiff for use in plaintiff's schools. (Bird's reply, Ex. C, ¶ 5 and Ex. A to Ex. C, ¶¶ 10–12). Additionally, the materials list on which plaintiff relies required that 20 year bonds be purchased for the roof, and yet there is no evidence that the bonds were actually purchased. Harnett states that Bird has no record of a bond being issued to plaintiff (Bird's Ex. C, ¶ 4), and Gerald Busch testified that he had no idea whether the bond was purchased. (Busch dep. at 168). This evidence shows another area where the materials list may not have been complied with.

In sum, the cumulative value of plaintiff's evidence is simply insufficient to establish that Bird's products were actually present in the high school. As the Supreme Court has stated,

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Because plaintiff has no evidence that Bird's asbestos felts were installed in Catasauqua High School, a crucial element of plaintiff's case, I must grant Bird's motion for summary judgment.

### III. *Pfizer's Motion for Summary Judgment.*

Plaintiff claims that Pfizer is liable because of repairs made to the Catasauqua High School with asbestos products manufactured by Pfizer, and also as a successor in liability to Basic. I discuss both contentions below.

Plaintiff claims that the asbestos-containing plaster in the Catasauqua Area High School is a product known as "Kilnoise". Pfizer manufactured Kilnoise from 1964 through 1972, and assumed all liabilities of the previous manufacturer, Gibsonburg Lime Products Company (GLPC), who manufactured Kilnoise since January 19, 1962. (Pfizer's Memorandum in Support of Summary Judgment at 2 & n. 2). Since plaintiff's high school was built during 1959 through 1961 (Pfizer's Ex. B No. 1), Pfizer did not manufacture the Kilnoise that was used in the high school's original construction. Plaintiff alleges, however, that subsequent repairs were made to the school using Kilnoise, and that Pfizer is liable for the Kilnoise used in this repair work.

Plaintiff relies on the depositions of Charles Gerancher, the head custodian of Catasauqua High School, and Frank J. Troxell, the principal of the high school, to

show that repairs were made in the high school. I have reviewed the deposition excerpts provided by plaintiff, and I find nothing in those excerpts where either of these individuals testified that repairs were made. Even assuming repairs were made, however, the evidence is insufficient to establish that Kilnoise was used in the repairs. Plaintiff relies solely on the testimony of Emery Q. Taglioli, the school's plaster foreman. Taglioli testified as follows:

Q. If during a renovation there is an acoustical ceiling in place and it was necessary to redo a portion of the ceiling and so on, would it be mandatory for you to use the same product that was in the first ceiling in the renovation on the second ceiling?

A. The spec would probably read to match existing.

Q. How would you make a determination as to what was existing?

A. I couldn't. As far as the product, I couldn't say that was USG and that was National. I could not do that.

Q. How about Kilnoise, could you tell the difference between—

A. No.

Q. So if you did have to place additional acoustical plaster in on a renovation, what would you do to match existing?

A. I would buy one of those three products and match it.

Q. So conceivably then if, let's say, a U.S. Gyp product was in the first ceiling and you came back and did renovations, it could be National Gyp or Kilnoise or a combination?

A. Absolutely.

Q. On a renovation such as that would you have any difficulty creating the bond between the—

A. No.

Q. Even if it was a different product?

A. No.

Q. As far as you know, at the time that you believed that there were some renovations in the office area of the high school, the three products which were still available for acoustical ceiling were National Gyp, U.S. Gyp and Kilnoise?

A. Yes.

Q. How about suppliers at that time, do you have any recollection of—

A. It would be those suppliers there that I have given you.

Q. Would all of those products be available from all the suppliers still?

A. Yes.

(Plaintiff's Response to Pfizer's Motion for Summary Judgment, Ex. B, Taglioli dep. at 68–69).

Plaintiff argues that the evidence that the spec was to match existing is sufficient to get to the jury the question of whether Kilnoise was used in repairs. I disagree. Taglioli's testimony shows nothing more than that there is a possibility that Kilnoise was used in the repair work. As Taglioli testified, the fact that Kilnoise was used in the original construction of the school does not mean that Kilnoise was subsequently used. Moreover, plaintiff has no other evidence that Kilnoise was used in repairs. The sum total of plaintiff's evidence amounts to no more than speculation that Kilnoise was used in repair work. The Supreme Court recently instructed that: "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Because plaintiff has not produced such evidence in this case, I must grant Pfizer's motion on the repair work issue.[2]

Plaintiff also argues that Pfizer is liable because it is a successor to Basic. Plaintiff bases its claim on the following undisputed facts: Basic manufactured Kilnoise be-

---

2. Plaintiff argues that summary judgment must be denied because Pfizer has not offered contradictory affidavits stating that Pfizer did not sell Kilnoise to plaintiffs. This argument was rejected by the Supreme Court in *Celotex Corpora-* *tion v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). See also *Wisniewski v. Johns-Mansville Corp.*, 812 F.2d 81, 83–84 (3d Cir.1987).

tween 1955 and 1962, during the time when plaintiff's high school was constructed. In 1962, GLPC purchased the right to manufacture and sell Kilnoise from Basic. Pfizer then purchased the rights to manufacture and sell Kilnoise from GLPC in 1964, and assumed all of GLPC's liabilities in connection with its sale of Kilnoise. In 1979, Combustion Engineering Inc., acting through a subsidiary known as CEBAS, acquired ownership of Basic. Following the acquisition, the name of CEBAS was changed to Basic, Inc., which Combustion Engineering has operated as a wholly-owned subsidiary since 1979.

Generally, "when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets." *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 18, 434 A.2d 106, 107 (1981). There are, however, several exceptions to this rule. *Id.* Plaintiff relies on two such exceptions to assert its claim of successor liability against Pfizer: the continuation exception and the product line exception.

■ The continuation exception applies where "the purchasing corporation is merely a continuation of the selling corporation." *Id.* "Continuity of a business in the form of a successor corporation will be found if there is a common identity of stock, directors, stockholders, and employees after the transfer from the selling corporation to the acquiring corporation." *Savini v. Kent Machine Works, Inc.*, 525 F.Supp. 711, 717 (E.D.Pa.1981). In this case, there is no evidence that GLPC and subsequently, Pfizer, was a continuation of Basic. Although GLPC purchased all rights to Kilnoise, Basic continued to function as an active company. Plaintiff argues that this exception applies because the subsequent merger of Basic and CEBAS arguably destroyed Basic as a separate entity. While this fact may have bearing on the issue of CEBAS' successor liability to Basic, it is not relevant to the question of whether, when GLPC acquired the rights to manufacture and sell Kilnoise, it

existed as merely a continuation of Basic, which is the relevant inquiry here.

The product line exception, adopted in *Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111, from *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981) provides:

> [W]here one corporation acquires all or substantially all of the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Ramirez*, 86 N.J. at 358, 431 A.2d at 825. Plaintiff concedes that "a corporation's mere purchase of a product line without more does not in itself comply with liability for torts caused by the predecessor's conduct." (Plaintiff's response regarding the issue of Pfizer's successor liability at 9). Plaintiff argues, however, that the circumstances in this case justify holding Pfizer liable under the product line exception. In particular, plaintiff relies on the fact that Basic is not the same entity since its merger with CEBAS, and also on the agreements between GLPC and Basic when GLPC acquired the rights to manufacture and distribute Kilnoise.

The purpose of the product line exception to successor non-liability is to provide relief to victims of defective products who would otherwise have no remedies. The *Dawejko* court, in adopting the exception, determined that "it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation." 290 Pa.Super. at 26, 434 A.2d at 111. Although the Dawejko court suggested a variety of factors to be considered in deciding whether it is appropriate to impose successor liability, I believe that the question of whether the plaintiff's remedies against the original manufacturer are destroyed must be a threshold considera-

tion. As my colleague Judge Ditter recently stated:

> The purpose of the product-line rule of successor liability was not to relieve sellers of liability once they discarded manufacturing divisions but to provide remedies for tort victims where it was equitable to do so because a successor stood in the shoes of a seller who had become unavailable. When a seller continues to be viable, the tort victim has not been deprived of a remedy and there is no need to impose successor liability on another corporation.

*Schweitzer v. Consolidated Rail Corp.,* 65 B.R. 794, 803 (D.C.E.D.Pa.1986).

█ In this case, Basic is still a viable corporation. It has several plants in operation, pays its salaried employees, pays its taxes, and is, in short, an active, functioning business. (Supplemental memorandum of Pfizer on the issue of successor liability, Ex. A (dep. of Brett, Secretary of Basic) at 60–67). Moreover, Basic has been an active defendant in this litigation. Although Basic presently has a negative net worth (*Id.* at 68) it has product liability insurance covering liabilities which may have arisen between 1959–1962, during the time plaintiff's high school was constructed. (Plaintiff's response regarding the issue of Pfizer's successor liability, Ex. D at 86–88). Given that Basic is a viable corporation and plaintiff's remedies against Basic are not destroyed, I see no justification for holding Pfizer liable for Basic's alleged liabilities in this case. "Holding defendant in the instant case could lead to the anamolous [sic] result that plaintiff[ ] would be granted a windfall of dual responsibility and dual liability for a single series of liability creating events attributable in fact to only one party, solely by virtue of the fortuitous circumstance of [the sale of a product line]." *Pizio v. Johns-Manville Corp.,* 9 Phila. 447, 454 (C.P.Phila.Co.1983)

█ Plaintiff further argues that Pfizer should be held liable because the merger agreement between Basic and CEBAS is ambiguous as to whether CEBAS assumed only Basic's liabilities that were known to Basic at the time of the merger, or all of Basic's liabilities. Plaintiff argues that if the former interpretation is correct, it may not be able to recover from the "new" Basic. Assuming arguendo that the Basic-CEBAS agreement is ambiguous, there is no question that under the agreement, Basic and CEBAS merged. See, e.g., Plaintiff's response regarding the issue of Pfizer's successor liability, Ex. C (Notice and Information Statement concerning Merger of Basic Incorporated into CEBAS, Inc.) Therefore, even if the original Basic ceased to exist, the new merged company would be liable for the original Basic's liabilities under the merger exception or the continuity exception to successor non-liability. *See, e.g., Dawejko,* 290 Pa.Super. at 18, 434 A.2d at 107.

█ Finally, plaintiff argues that the Basic-GLPC agreement relating to the sale of the rights to Kilnoise is ambiguous as to whether GLPC assumed Basic's prior liabilities arising from the manufacture of Kilnoise. The determination of whether a contract is ambiguous is a matter of law for the court. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980). If a contract is clear, then its interpretation is also a matter of law for the court to decide. *Pines Plaza Bowling Inc. v. Rossview, Inc.,* 394 Pa. 124, 145 A.2d 672, 676 (1958). I have reviewed the Basic-GLPC agreement, and I find that it is unambiguous. Section 2.1 of the agreement provides in part: "Basic will indemnify and hold GLP harmless from and against any claims asserted against GLP with respect to any hydrated lime products sold by Basic prior to the Closing Date." (Plaintiff's response regarding the issue of Pfizer's successor liability, Ex. B). I conclude that this agreement is clear and means that GLPC, and subsequently Pfizer, did not, by virtue of this agreement, assume Basic's prior liabilities from its manufacture of Kilnoise. For all of these reasons, I will grant Pfizer's motion on the issue of successor liability.

### IV. *Joint Motion for Summary Judgment on Punitive Damages*

Defendants Bird, Pfizer and Basic move for summary judgment on the issue of punitive damages. Additionally, defendant Eagle-Picher makes reference to its position concerning punitive damages in the

memoranda it has filed with the court, although it has made no motion on this issue. As to Bird and Pfizer, this motion is moot because of my resolution of their summary judgment motions discussed in parts II and III of this opinion. I discuss the punitive damage claim as it relates to the other defendants below.

### 1. *Basic*

Basic claims that plaintiff's evidence is insufficient to support a claim of punitive damages. Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 169, 494 A.2d 1088 (1985) (quoting § 908(2) of Restatement of Torts (Second)). In support of its claim for punitive damages plaintiff makes two arguments: first, that Basic's conduct in selling asbestos products for installation in plaintiff's school was outrageous because plaintiff knew of the dangers of asbestos, and second, that Basic's conduct was outrageous because it failed to warn plaintiff of the dangers once it had discovered them.

█ I find that the evidence presented is insufficient to allow the jury to consider imposing punitive damages. Unlike compensatory damages, the purpose of punitive damages is to punish and deter outrageous conduct. *Martin*, 508 Pa. at 169, 494 A.2d at 1096. Therefore, before punitive damages may be imposed, it is necessary to find that the wrongdoer acted wrongfully despite the fact that he was aware or had reason to be aware [3] of a significant risk. *Id.* at 171 and n. 12, 494

A.2d at 1097 & n. 12; *Ivins v. Celotex Corp.*, 115 F.R.D. 159, 165 (E.D.Pa.1986).[4]

The evidence presented in this case does not demonstrate that Basic acted outrageously in selling its product for use in plaintiff's schools. Plaintiff primarily relies on a group of articles that discuss problems caused by asbestos exposure; however, these articles concern the problems caused by consistent exposure to asbestos fibers, primarily due to occupational exposure. None of the articles presented by plaintiff discuss risks from the type of asbestos exposure at issue in this case. Articles discussing the risks of asbestos exposure generally were rejected as a basis for punitive damages by the Pennsylvania Supreme Court in *Martin*, 508 Pa. at 177, 494 A.2d at 1100.

Similarly, plaintiff's evidence does not raise a question of fact as to whether Basic was outrageous in failing to warn plaintiff of dangers it later discovered. Plaintiff relies on the deposition of Harry E. Rourke, a former Basic and Pfizer employee, who testified he began to be aware of potential problems with Kilnoise in the late 1960's. By this time, however, Rourke was no longer a Basic employee. Finally, although an article discussing the risks from the type of exposure at issue in this case was published in 1979, (Defendants' Joint Motion on Punitive Damages, Ex. B) the article concluded: "[T]he long-term exposure of many children to [particular concentrations of asbestos] may not be without later risk of asbestos disease." Nicholson, Swoszowski, Rohl, Todaro & Adams, *Asbestos Contamination in United States Schools from Use of Asbestos Surfacing Materials*, New York Academy of Sciences,

---

**3.** In *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985), the court, in a plurality opinion, held that only indifference to a known risk, as opposed to failure to appreciate a risk, is a sufficient basis to justify imposition of punitive damages. *Id.* at 171, 494 A.2d at 1097. The concurring opinion, joined by two justices, specifically took issue with this position, and at least one court has held that the *Martin* plurality is not controlling and that punitive damages may be awarded where an actor should have appreciated a significant risk. See *Ivins v. Celotex Corp.*, 115 F.R.D. 159 (E.D.Pa.1986).

**4.** Recently, the Third Circuit discussed the evidence necessary to sustain a claim for emotional distress in *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81 (3d Cir.1987). In rejecting a claim for emotional distress caused by the fear of contracting asbestos-related diseases through contact with relatives' clothing, the court stressed that to find outrageousness, it was necessary for evidence to show that the actor was aware of the particular risk involved. *Id.* at 86. The Third Circuit noted that the level of outrageousness necessary to sustain a claim for punitive damages is comparable to that required for a claim of emotional distress. *Id.* at 86 n. 3

587, 595 (1979). Given the indefinite conclusion of this article and especially the lack of evidence that any employee of Basic knew of this article or otherwise became aware of dangers of asbestos products already in place in buildings, I conclude that the evidence is simply insufficient to support an award of punitive damages. Accordingly, Basic's motion on the punitive damages claim shall be granted.

### 2. *Eagle-Picher*

Eagle-Picher did not join in defendants' motion for punitive damages, but instead submitted a memorandum of law discussing generally whether plaintiff's evidence was sufficient to hold Eagle-Picher in the case. Eagle-Picher explained that it desired to state its position to the court but was not, for reasons irrelevant here, filing a summary judgment motion. (Supplemental memorandum of Eagle-Picher regarding summary judgment and other matters at 2). Plaintiff apparently felt a need to respond to this memorandum and in its response, specifically argued that Eagle-Picher should be liable for punitive damages. Eagle-Picher then filed a memorandum in response.

Although I could conceivably treat these submissions as a motion and response on the punitive damages claim as it pertains to Eagle-Picher, I decline to do so. Upon review of the memoranda, it appears that both plaintiff and Eagle-Picher were simply protecting their position on the punitive damages issue—plaintiff, to make clear that it was asserting a claim for punitive damages against Eagle-Picher, and Eagle-Picher to make certain that it was not waiving its defense—rather than thoroughly addressing the punitive damages claim. Moreover, Eagle-Picher stated that it was not filing a motion on the punitive damages issue. (Eagle-Picher's reply to plaintiff's response to Eagle-Picher's supplemental memorandum at 1). I will therefore not rule on this issue as it relates to Eagle-Picher at this time.

### V. *Medical Monitoring Claim*

Plaintiff also seeks the creation of a fund to cover costs of medical monitoring of its employees to aid in the early detection of asbestos-related diseases. Defendants argue that this claim does not assert a case or controversy, that plaintiff has no standing to assert this claim, and that, given that no employee has any manifestation of an asbestos disease, such a claim is barred by Pennsylvania law.

I desire to further consider this claim in light of the recent decision of the New Jersey Supreme Court in *Ayers v. Township of Jackson, a Municipal Corp. of the State of N.J.*, 106 N.J. 557, 525 A.2d 287 (1987). I will also allow the parties to file an additional short memorandum discussing the impact, if any, of the *Ayers* decision on this case.

### VI. *Conclusion*

Upon consideration of the motions, memoranda of law, supporting exhibits, and comments at oral argument, I shall grant Bird's motion for summary judgment; Pfizer's motion for summary judgment, and judgment on the punitive damages claim in favor of Basic. I shall further consider the medical monitoring claim in light of the *Ayers* decision.