Harold E. PUTT and Carol Putt,
his wife, Appellees,

v.

YATES–AMERICAN MACHINE COMPANY, B.M. Root Corporation, Martin Electrical Service, Inc., Appellees,

v.

UIS Inc., Appellant.

Superior Court of Pennsylvania.

Argued April 1, 1998.
Filed Sept. 28, 1998.

Edward Hannan, Milwaukee, WI, and Leo E. Gribbin, Jr., York, for appellant.

Wayne C. Parsil, Lancaster, for Putt, appellees.

Robert Tribeck, Rhoads & Sinon LLP, Harrisburg, for Yates–American, appellee.

Before JOHNSON, STEVENS and OLSZEWSKI, JJ.

STEVENS, J:

Harold E. Putt's right hand was amputated while he was using a wood-molding machine [1] at his place of employment. While he was working, Mr. Putt discovered that a piece of lumber was lodged in the wood-molding machine, thereby jamming it. Mr. Putt's co-worker turned off the machine, and while Mr. Putt attempted to loosen the piece of lumber manually with his right hand, the machine's rear cutter head severed Mr. Putt's right hand.

On April 19, 1990, Mr. Putt and his wife filed a complaint against Yates American Machine Company (Yates), B.M. Root Corporation (Root), and Martin Electrical Service, Inc. (Martin Electrical). In their complaint, the Putts proceeded upon a theory of strict products liability, contending that the wood-molding machine had been defectively designed by Yates, who then sold it to Root.[2] The Putts also proceeded upon a theory of negligence against Yates and Root; however, the negligence counts were later withdrawn. In addition, the Putts raised a negligence claim against Martin Electric, who repaired the machine's wiring prior to Mr. Putt's injury. Finally, Ms. Putt alleged a derivative claim of loss of her husband's consortium. Defendants denied the allegations.

On June 18, 1990, Yates joined United Industrial Syndicate, Inc. (UIS) as an additional defendant. In its complaint, Yates averred that UIS was the successor of S.A. Woods Machine Company (S.A.Woods), which manufactured the wood-molding machine at issue, and, therefore, that UIS was liable for Mr. Putt's injury. Yates also raised various breach of contract claims. The case was submitted to a jury on October 31, 1994; however, the trial court reserved the question of corporate successor liability for the court's determination as a matter of law.

Following deliberations, the jury concluded that the wood-molding machine was defective when it left the manufacturer, but found that the defect was not a substantial factor in causing Mr. Putt's injury. Moreover, the jury found Martin Electrical negligent. The trial court determined that the jury's verdict was inconsistent, provided the jury with an additional charge, and then instructed the jurors to deliberate again.

---

1. A wood-molding machine is used to shape wood, thereby creating decorative shapes used primarily for molding in residential and commercial buildings. N.T. 11/1/94 p. 118. The molding machine at issue had four cutter heads which shaped the wood. The cutter heads were directly driven by a motor; there were no gears. N.T. 11/1/94 pp. 119–120.

2. S.A. Woods Machine Company (S.A.Woods) was the original manufacturer and designer of the wood-molding machine. The Putts named Yates, believing that it was the corporate successor to S.A. Woods. The Putts sued Root because the company sold the machine to the Hershey Lumber Company who then sold it to Mr. Putt's employer.

The jury's second verdict indicated that the machine was defective and that the defect was a substantial factor in causing Mr. Putt's injury and the jury again found Martin Electrical to be negligent. The jury further concluded that Mr. Putt was contributorily negligent. The jury then assigned the seller/manufacturer ten percent (10%) of the fault, Martin Electrical sixty percent (60%) of the fault, and Mr. Putt thirty percent (30%) of the fault. Finally, the jury indicated that damages should be in the total amount of $630,000.00.

Subsequent to the jury's verdict, the trial court determined that UIS, and not Yates, was S.A. Wood's successor. Accordingly, the trial court concluded that UIS was liable to the Putts but that Yates was not. On August 30, 1995, the trial court ordered Root to pay the seller/manufacturer's share of the jury's verdict, $252,000.00, to the Putts. However, the trial court found that UIS owed Root a duty of indemnification, and ordered UIS to indemnify Root for the entire $252,000.00. Finally, the trial court ordered UIS to pay Yates $95,896.00 in attorney fees pursuant to a contract between the parties.

UIS filed timely post-trial motions for judgment n.o.v. and/or a new trial, which were denied by the trial court. Following the entry of final judgment, this appeal was filed.

On appeal, UIS contends that judgment n.o.v. and/or a new trial is warranted for the following reasons: (1) The Putts failed to show that UIS was strictly liable under § 402A of the Restatement (Second) of Torts since there were substantial modifications made to the wood-molding machine which were the proximate cause of Mr. Putt's injury; (2) The trial court erred in failing to mold the jury's first verdict, in recharging the jury, and in accepting the jury's second verdict; (3) The trial court erred in concluding that UIS, and not Yates, succeeded S.A. Woods; (4) The trial court erred in awarding Yates attorney's fees; and, (5) The trial court violated the Equal Protection Clause and Pa. R.C.P. 238 by ordering UIS to pay the Putts'

share of the delay damages.[3] We find that the trial court improperly awarded Yates attorney's fees, and, therefore, we reverse as to this issue. In all other respects, we affirm.

Our standard of review is well settled. In examining a denial of judgment n.o.v., we must read the record in the light most favorable to the verdict winners and grant them the benefit of every favorable inference, thereby determining whether there is sufficient competent evidence to support the verdict. *Wenrick v. Schloemann-Siemag*, 523 Pa. 1, 564 A.2d 1244 (1989). Judgment n.o.v. may be entered if the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Phillips v. A-Best Products Company*, 542 Pa. 124, 665 A.2d 1167 (1995). "If there is any basis upon which the jury could have properly made its award, the denial of the motion for judgment n.o.v. must be affirmed." *Sewak v. Lockhart*, 699 A.2d 755, 759 (Pa.Super.1997) (quotation omitted). In examining the trial court's denial of a new trial, we must determine whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion. *Dougherty v. Edward J. Meloney, Inc.*, 443 Pa.Super. 201, 661 A.2d 375 (Pa.Super.1995).

UIS' first argument is that there is no competent evidence supporting the finding that UIS is strictly liable under Section 402A. We find that the evidence was such that two reasonable minds could disagree as to the outcome and that the trial court did not abuse its discretion.

■ In product liability cases, Section 402A of the Restatement (Second) of Torts has been adopted as the law of this Commonwealth. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). To prevail under Section 402A, "the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Riley v. Warren Manufacturing, Inc.*, 455 Pa.Su-

---

**3.** UIS' arguments have been renumbered and consolidated for the sake of effective appellate review.

per. 384, 688 A.2d 221, 224 (Pa.Super.1997) (citation omitted). If there has been a substantial modification made to the product, which was not reasonably foreseen by the manufacturer, and if the modification is a superseding cause of the user's injury, the manufacturer is relieved of liability even if there was a design defect existing at the time the product was delivered to the purchaser. *Thompson v. Motch & Merryweather Machinery Company*, 358 Pa.Super. 149, 516 A.2d 1226 (Pa.Super.1996).

█ With regard to the first prong, the plaintiff may show that the product was defective due to a design defect, i.e. that the design of the machine resulted in an unreasonably dangerous product. *Riley*, 688 A.2d at 224. In determining whether a product design is defective, we must consider whether the product was equipped with the proper safety devices which would allow the user to avoid danger when using the product. *DiFrancesco v. Excam, Inc.*, 434 Pa.Super. 173, 642 A.2d 529 (Pa.Super.1994). "We have held that in a defective design case, the question is whether the product should have been designed more safely for its intended use." *Id.* at 531 (citation omitted).

█ In the case *sub judice*, we agree with the trial court's conclusion that the wood-molding machine was defective. The Putts' expert, Jerodd Weiner, testified that at the time of Mr. Putt's accident the machine was defective in two ways. First, the machine's cutter heads had an excessively long "coasting" time,[4] and, second, there were no protective guards [5] covering the cutter heads, thereby permitting users to come into contact with the dangerous, running blades when they attempted to remove lumber which was jammed in the machine. N.T. 11/1/94 p. 128. Mr. Weiner, an electrical engineer, explained that protective metal guards existed which would have prevented Mr. Putt from coming into contact with the rear cutter head and that feasible stopping mechanisms existed which would have stopped the cutter heads within four seconds after the machine was "turned off." N.T. 11/1/94 pp. 180, 192. Inasmuch as the machine lacked the protective guards and had a long "stopping time," Mr. Weiner opined that the machine was defective.

█ UIS agrees that the wood-molding machine was defective at the time of Mr. Putt's accident. However, UIS contends that the Putts did not satisfy the second prong in that they failed to show that the defects existed when the machine "left the manufacturer's hands." Specifically, UIS contends that the machine's original design included "hold down shoes" which protected workers from coming into contact with the cutter heads [6] and that the machine was designed with a plugging circuit which, when used properly, would stop the cutter heads within four seconds.

Although UIS' expert testimony supports UIS' arguments, the Putts' expert's testimony does not. Mr. Weiner testified with a reasonable degree of professional certainty that the wood-molding machine, as manufactured, was defectively designed. Specifically, he testified as follows regarding the state of the machine when if left the manufacturer's "hands:" Originally, the machine was equipped with "hold down shoes," but, contrary to UIS' assertion, the shoes were not protective guards preventing a user from reaching into the machine and coming into contact with the cutter heads. N.T. 11/1/94 pp. 161–162, 189. Rather, the "hold down shoes" were designed to keep sawdust out of

---

**4.** The phrase "coasting time" refers to the amount of time it took for the cutter blades to come to a complete stop after the machine's "off" button was pushed. The Putts' expert testified that, at the time of Mr. Putt's accident, the cutter blades continued running for approximately sixty-three seconds after the machine was "turned off." N.T. 11/1/94 p. 126.

**5.** Mr. Weiner informed the court that guards are "fixed barriers which are a structured metal ... which would prevent [users from] coming into

contact [with] a hazardous area of the machine." N.T. 11/1/94 p. 128.

**6.** At trial, UIS also argued that the location of the rear cutter head acted as a guard, and, therefore, additional guards were not needed. However, UIS abandoned this argument on appeal. In any event, Mr. Weiner testified that the "guarded by location" theory did not apply in this case since the location of the rear cutter heads permitted access to the blades. N.T. 11/1/94 p. 134.

the user's eyes and to prevent lumber from vibrating as it was being cut. N.T. 11/1/94 p. 190. In addition, the "hold down shoes" were able to be adjusted so that they would not cover the rear cutter head area where Mr. Putt was injured. N.T. 11/1/94 pp. 189–190. As such, the shoes had no impact on safety with regard to the cutter heads. N.T. 11/1/94 pp. 190, 192. Mr. Weiner opined that, when manufactured, there was absolutely no protective guard for the rear cutter head. He indicated that when the machine was manufactured solid metal guards existed which would have protected the rear cutter head and would have prevented Mr. Putt from coming into contact with the blade, thereby making the wood molder safer. N.T. 11/1/94 p. 189.

With regard to the plugging circuit, Mr. Weiner acknowledged that the original design included such a stopping feature and that it stopped the cutter heads within four seconds after the feature was engaged. However, he argued that the machine, as designed, could be stopped by two other methods and that both of the said methods required the cutter heads to "coast" for a period of time before they arrived at a complete stop. N.T. 11/1/94 pp. 104–105. As such, Mr. Weiner opined that, although the machine possessed a plugging circuit, it was still defectively designed since it did not have guards over the rear cutter heads protecting the user when another stopping mechanism was employed.

With regard to the third prong, UIS avers that the alleged defective design was not the proximate cause of Mr. Putt's injury. Specifically, UIS avers that the "hold down shoes" were removed by Mr. Putt's employer and that the plugging circuit system was unforeseeably destroyed when the wood-molding machine caught on fire while it was being used at Mr. Putt's place of employment.[7] As such, UIS argues that, even if the machine's design was defective when it left the manufacturer's hands, there were substantial, unforeseeable modifications made to the wood molder which were a superseding cause of Mr. Putt's amputation.

As discussed previously, Mr. Weiner testified that the "hold down shoes" were not a protective guard, and, therefore, the fact that they may have been removed is irrelevant to the issue of causation. As for the destruction of the plugging circuit, Mr. Weiner opined that even with the plugging circuit in place the wood molder was defective since the machine could be stopped in other ways which would permit the cutter heads to "coast to a stop." In this case, the wood molder was stopped by one of the other methods provided by the original design. As such, we find that the trial court did not err in concluding that the destruction of the plugging circuit was not a superseding cause of Mr. Putt's amputation.[8]

UIS' next argument challenges the trial court's actions with regard to the jury's verdict. Following the trial court's charge, the jury was given a verdict slip containing special interrogatories to be considered and answered by the jury. Following deliberations, the jury returned the verdict slip indicating that, although the wood molder was defective when it left the manufacturer, such defect was not a substantial factor in causing Mr. Putt's injury. However, the jury then attributed ten percent (10%) of the fault to the manufacturer. The verdict slip also reflected that Martin Electrical was negligent, that its negligence was a substantial factor in causing Mr. Putt's injury, and that it was sixty percent (60%) at fault. Finally, the verdict slip indicated that Mr. Putt was negligent, but that he did not "assume the risk." As such,

7. After the fire, Martin Electrical re-wired the wood-molding machine. After it was re-wired, the machine no longer possessed the plugging circuit mechanism.

8. UIS also suggests that a letter sent to Mr. Putt's employer indicating that the plugging circuit was to be tested and that protective guards needed to be in place relieves UIS of liability. UIS' Brief pp. 7, 15. Assuming, *arguendo*, that the letter constitutes a warning regarding defects, we disagree. In *Sheehan v. Cincinnati Shaper Company*, 382 Pa.Super. 579, 555 A.2d 1352 (Pa.Super.1989), this Court held that a manufacturer's duty to warn of defects extends to the ultimate user and that a manufacturer is not relieved of liability by warning the employer only. In this case, the alleged notice to Mr. Putt's employer did not serve to make Mr. Putt aware that the wood molder was defective.

Mr. Putt was found to be thirty percent (30%) contributorily negligent, but the manufacturer was not relieved of liability.

The trial court found the verdict to be irreconcilable as to the manufacturer's liability, and, therefore, the court re-instructed the jury and requested them to return a consistent verdict. The jury then returned a verdict finding that the wood molder was defective when it left the manufacturer, that the defect was a substantial cause of Mr. Putt's injury, and that the manufacturer was 10% at fault. UIS contends that the trial court should have molded the jury's first verdict and should have assigned the manufacturer zero percent (0%) of the fault.

 "It is well established in Pennsylvania that there is a presumption of consistency with respect to a jury's findings." *Goldmas v. Acme Markets, Inc.*, 393 Pa.Super. 245, 574 A.2d 100, 103 (Pa.Super.1990) (citation omitted). However, although there is such a presumption, "the verdict to be molded must manifest a clear intent on the part of the jury. When the intention of the jury is far from obvious, the verdict should be returned to the jury for further deliberations or a new trial should be granted." *Chiaverini v. Sewickley Valley Hospital*, 409 Pa.Super. 630, 598 A.2d 1021, 1022 (Pa.Super.1991) (citations omitted).

 Rather recently, this Court, *en banc*, addressed the precise issue raised in the case *sub judice* under circumstances remarkably similar to the case at bar. In *Curran v. Greate Bay Hotel and Casino*, 434 Pa.Super. 368, 643 A.2d 687 (Pa.Super.1994),[9] a jury found that Defendant Sands Hotel and Casino (Sands) was negligent and that its negligence was not a substantial factor in causing harm to the plaintiffs, but then assigned thirty percent (30%) of the fault to Sands.

The jury also found that Defendant Eastern Engineering and Elevator Company (Eastern) was negligent, that its negligence was a proximate cause of the plaintiff's injury, and that Eastern was seventy percent (70%) at fault. The jury concluded that the plaintiff was not negligent, but a panel of this Court found that it was unclear from the jury's verdict whether Sands was liable. Although the jury determined that Sands was negligent, it also found that Sand's negligence was not a substantial factor in causing the plaintiff's harm. As such, we found that the trial court was not permitted to mold the jury's verdict.

Relying on the Supreme Court's decision in *Ferrick Excavating v. Senger Trucking*, 506 Pa. 181, 484 A.2d 744 (1984), this Court, in *Curran*, determined that the answers to the interrogatories set up an irreconcilable inconsistency between the finding in question number two that Sand's negligence was not a substantial factor in bringing about the plaintiff's harm and the finding in question number three that Sands was 30% at fault. *Curran, supra.* This Court specifically found that question number three, addressing damages, was not mere surplusage and that it needed to be consistent with the other answers. We further found that "if the trial judge must assume facts which cannot be discerned from the verdict, then the verdict should not be molded." *Id.* at 689.

 As in *Curran* and *Ferrick Excavating*, we find the jury's answers to the interrogatories at issue to be irreconcilably inconsistent. We cannot explain how the jury's first verdict could apportion damage to the manufacturer after determining that the manufacturer was not the legal cause for Mr. Putt's injury, and that Martin Electrical and Mr. Putt were the cause of the injuries. Under such circumstances, the trial court

**9.** In *Curran,* Judge Del Sole authored the majority opinion, which was joined by Judges Popovich, Johnson, and Ford Elliott. As will be discussed *infra,* the majority concluded that the jury's verdict was irreconcilable and that the trial court improperly molded the verdict. However, the majority found that a new trial was not required since the issue had been waived. Judge McEwen dissented. Judge Beck filed a concurring and dissenting opinion, which was joined by Judges Rowley, Tamilia, and Hudock. In her opinion, Judge Beck indicated that she agreed with the majority's analysis concerning the consistency of the jury's verdict; however, she found that the issue had not been waived, and, therefore, she would have remanded for a new trial. We find the reasoning in *Curran* to be persuasive, and, therefore, we have applied the rules enunciated therein to this case. We note that UIS's allegation regarding the jury's verdict has been preserved since an objection was made prior to the trial court's re-instruction of the jury.

could do no more than guess at the jury's thinking. As such, we find that the trial court properly re-instructed the jury and properly accepted the jury's second, consistent verdict. *Chiaverini, supra* (where jury determined that defendant was negligent and that his negligence was not a substantial factor in causing the jury's harm, but then indicated that defendant was to pay the plaintiff fifty thousand dollars, trial court should not have accepted the verdict). Therefore, the trial court properly denied UIS' motion for judgment n.o.v. and/or a new trial on this basis.

UIS' next contention is that the trial court erred in finding that it was liable for the wood molder's defective design since it did not manufacture the machine and successor liability was not proven. UIS also contends that Yates was the successor of S.A. Woods, the manufacturer of the machine, under the product line exception, and, therefore, Yates should have been held strictly liable.

■■■■ "The general rule is that when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of the succession to the transferor's assets." *Dawejko v. Jorgensen Steel Company*, 290 Pa.Super. 15, 434 A.2d 106, 107 (Pa.Super.1981) (citations omitted).

> However, the general rule does not apply and liability attaches to the successor when one of the following is shown: 1) The purchaser expressly or impliedly agrees to assume such obligation; 2) The transaction amounts to a consolidation or merger; 3) The purchasing corporation is merely a continuation of the selling corporation; 4) The transaction is fraudulently entered into to escape liability; 5) The transfer was not made for adequate consideration and provisions were not made for the creditors of the transfer; and, 6) The successor undertakes to conduct the same manufacturing operation of the transferor's product lines in essentially an unchanged manner. The successor is then strictly liable for injuries caused by defects in the product line, even if previously manufactured and distributed by the transferor. [This has been labeled the product-line exception.]

*Childers v. Power Line Equipment Rentals*, 452 Pa.Super. 94, 681 A.2d 201, 212 (Pa.Super.1996) (citation omitted). The trial court held that UIS was subject to strict liability for the defect in the wood-molding machine because it expressly assumed such liability. We agree.

Yates' expert testified as follows regarding the genealogy of the wood molder and its line of manufacturers: S.A. Woods manufactured the wood molder at issue in 1949. In 1958, S.A. Woods became a wholly owned subsidiary of UIS. In February of 1960, three of UIS' wholly owned subsidiaries, including S.A. Woods, merged; the surviving company was called GKB Company, Incorporated (GKB). The Agreement and Plan of Merger indicated that:

> The rights of creditors...of any constituent corporation shall not in any manner be impaired, nor shall, any liability or obligation...or any claim...be released or impaired, by the merger, but such surviving corporation shall be deemed to have assumed, and shall be responsible and liable for, all liabilities and obligations of each of the constituent corporations in the same manner...as if such surviving corporation had itself incurred such liability....

Exhibit Y-7, Agreement and Plan of Merger dated 5/6/60 p. 1. Upon the filing of the Articles of Consolidation, which effectuated the merger, S.A. Woods' existence as a separate entity ceased and GKB expressly accepted its assets and liabilities. On July 21, 1960, UIS formed a new corporation, naming it the S.A. Woods Machine Company, which was an inactive company holding no assets and which was formed for the primary purpose of preserving GKB's right to manufacture products under the S.A. Woods name. On July 28, 1961, UIS, GKB, and Yates entered into an agreement whereby Yates purchased GKB's "machinery and equipment used in the motor department, jigs, tools, dies, patterns, drawings, all of its woodworking machinery business, including the exclusive right to use its trademarks and trade names." Exhibit Y-6A, Bill of Sale dated 8/1/61 p. 1. Also, as part of the sale, Yates

assumed GKB's trade payables, amounting to approximately forty-five thousand dollars ($45,000.00). The Agreement between the parties provided that, "[e]xcept as provided above (relating to the trade payables), Yates does not assume any liabilities or undertake to perform any obligations whatsoever of S.A. Woods or GKB...All assets will be sold and conveyed free of any liabilities of S.A. Woods and GKB..." Exhibit D, Agreement dated 7/28/61 p. 4. Moreover, the Bill of Sale provided, "[t]he undersigned (GKB) warrants that it is the true and lawful owner of the said property...and it does for itself, its successors and assigns, covenant and agree to warrant and defend said property and assets to Yates, against the lawful claims and demands of any person or entity whatsoever." Exhibit Y–6A, Bill of Sale dated 8/1/61 p. 2. In addition, the Agreement provided that UIS became a "party to the agreement in order to induce Yates to enter into the agreement." Exhibit Y–5, Agreement dated 7/28/61 p. 1.

On December 29, 1961, GKB merged with UIS. Pursuant to this merger, UIS was the surviving corporation and specifically "assumed all liabilities and obligations of GKB." Exhibit Y–8 and 9, Notices of Merger dated 1/2/62 p. 1 and dated 12/29/61 p. 1. As of December 29, 1961, GKB ceased to exist as a separate legal entity and title of its assets vested in UIS. At trial, the trial court took judicial notice of the merger involving UIS and GKB.

Based on the aforementioned, we find that the trial court properly concluded that UIS expressly agreed to accept liability for the wood molder. As the record reveals, GKB expressly and unambiguously assumed all liability and obligations with regard to S .A. Woods when S.A. Woods merged into GKB. GKB then sold its rights with regard to S.A. Woods to Yates on July 28, 1961. Yates specifically did not assume any liabilities or obligation; however, GKB expressly and unambiguously agreed to accept all liability with regard to S.A. Woods. When GKB merged with UIS, UIS expressly and unambiguously assumed all liabilities and obligation of GKB, including those relating to S.A. Woods. Since UIS was a party to the agreement between Yates and GKB, it is clear that UIS had actual notice that GKB reserved all liabilities relating to S.A. Woods. Accordingly, since UIS expressly agreed to assume all liabilities, it was proper for the trial court to find UIS liable for the defective wood molder as a successor corporation.

As for UIS' attempt to shift the liability to Yates under the product-line exception, we note that such a tactic was attempted and failed in *Hill v. Trailmobile, Inc.*, 412 Pa.Super. 320, 603 A.2d 602 (Pa.Super.1992). As this Court stated in *Hill:*

> The product-line exception is a remedy which was created to afford relief to *plaintiffs*, victims of manufacturing defects who, due to the sale or transfer of the Manufacturing corporation, otherwise would have no avenue of redress for injuries caused by defective products. Appellant Trailmobile's effort to obtain indemnification from codefendants through the product-line exception subverts the policy considerations that prompted adoption of the rule.

*Hill,* 603 A.2d at 607 (citations omitted) (emphasis in original). As such, we find that the trial court properly denied UIS' motion for judgment n.o.v. and/or a new trial on this basis.

UIS' next argument is that the trial court erred in finding that UIS had a contractual obligation to pay Yates' attorney's fees in defending the underlying action. Specifically, UIS argues that the agreements between Yates and UIS did not explicitly provide that UIS would pay Yates' attorney's fees, and, therefore, the trial court erred.

In arguing that UIS was not obligated to indemnify Yates for its attorney's fees, UIS relies on a provision of the Bill of Sale executed between UIS, GKB, and Yates to consummate the sale of GKB's assets to Yates. The Bill of Sale provided in pertinent part:

> The undersigned [GKB] warrants that it is the true and lawful owner of said property and assets and has full power and lawful authority to dispose of them, and it does for itself, its successors and assigns, covenant and agree to warrant and defend said property and assets to Yates–American

Machine Company, its successors and assigns, against the lawful claims and demands of any person or entity whatsoever. Exhibit Y–6A, Bill of Sale dated 8/1/61 p. 2. In construing the Bill of Sale, we must give its words, phrases, and clauses their plain and ordinary meaning. *Deskiewicz v. Zenith Radio Corporation*, 385 Pa.Super. 374, 561 A.2d 33 (Pa.Super.1989). Although parties to a lawsuit are generally responsible for their own attorney's fees, where one party expressly contracts to pay the other's fees, such an obligation will be enforced. *Id.*

▮ We agree with UIS' assertion that the provision at issue is not a broad indemnity clause requiring UIS to defend Yates in a products liability case such as the one *sub judice.* The language of the provision suggests nothing more than a simple warranty by the seller (UIS/GKB) that the property sold was free and clear of the claims of third parties. In a single sentence, GKB warranted: (1) "that it is the true and lawful owner of [specified] property," (2) that it "has...lawful authority to dispose of [that property]," and (3) that it would "warrant and defend said property...to Yates...." Exhibit Y–6A, Bill of Sale dated 8/1/61 p. 2. Indemnification is indicated only to the extent necessary to *vindicate the title* conveyed *from claims of title* made by third parties to the agreement. Moreover, the property in question is specifically warranted only "to Yates" and not to the world at large. Accordingly, none of the language in the Bill of Sale suggests any intent by the parties that the seller's obligation "to warrant and defend said property," should extend to the defense of product liability suits. Therefore, we reverse the trial court's order awarding attorney's fees to Yates.

UIS' final argument is that the trial court erred in ordering UIS to pay the Putts' share of delay damages. Specifically, UIS argues that the trial court's order violates Pennsylvania Rule of Civil Procedure 238 and that it violates the Equal Protection Clause.

▮ In this case, the jury found (1) the manufacturer (UIS) strictly liable and apportioned 10% of the fault to it, (2) Martin Electrical negligent and apportioned 60% of the fault to it, and (3) Mr. Putt contributorily negligent and apportioned 30% of the fault to him. Believing that a strictly liable defendant should be liable for a contributorily negligent plaintiff's actions, the trial court molded the verdict and assigned forty percent (40%) of the fault to UIS, 60% of the fault to Martin Electrical, and zero percent (0%) of the fault to Mr. Putt. The trial court then awarded delay damages based on the molded verdict and ordered UIS to pay its share (40%) of the delay damages. UIS argues that the apportionment of delay damages should have been made on the basis of the jury's actual verdict and not on the basis of the court's molded verdict. UIS' narrow argument is based on the phrase "verdict of the jury," which is found in Rule 238.

Rule 238 provides, in relevant part, the following:

> (a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, debt or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendants found to be liable to the plaintiff in the *verdict of the jury* ....

Pa.R.C.P. 238(a)(1) (emphasis added). The appellate courts of this Commonwealth have expressly and implicitly indicated that Rule 238's phrase "verdict of the jury" means the verdict of the jury as properly molded by the trial court and reduced to judgment. *See Liberty v. Geneva College*, 456 Pa.Super. 544, 690 A.2d 1243 (Pa.Super.1997) (delay damages were to be calculated on molded verdict); *Hughes v. GAF Corporation*, 364 Pa.Super. 311, 528 A.2d 173 (Pa.Super.1987) (holding that under Rule 238 delay damages were to be calculated on molded portion of verdict in products liability action rather than on total verdict); *Kowal v. Com. Dept. of Transportation*, 100 Pa.Cmwlth. 593, 515 A.2d 116 (Pa.Cmwlth.1986) (expressly holding that the phrase "verdict of the jury" means the molded verdict).[10] Here, there has been no allegation that it was improper

10. While we are not bound by the Commonwealth Court of Pennsylvania's decision, we find it to be persuasive, and, therefore, we have applied it to the facts of this case.

for the trial court to mold the verdict or that the molded verdict does not reflect the jury's actual assessment of liability. *Liberty, supra.* Accordingly, we find that the trial court did not abuse its discretion in calculating the delay damages based on the molded jury verdict, and, therefore, the trial court properly denied UIS' motion for judgment n.o.v. and/or a new trial on this basis. *Liberty, supra* (trial court's award of delay damages is reviewed under the abuse of discretion standard).

UIS also contends that the trial court's imposition of delay damages pursuant to Rule 238 violated the Equal Protection Clause of the Fourteenth Amendment.[11] Specifically, UIS argues that the trial court treated UIS and Martin Electrical, two similarly situated defendants, differently when it ordered UIS to pay the Putts' share of the delay damages. We find this argument to be specious.

The Equal Protection Clause provides that "[n]o state shall...deny to any person within its jurisdiction the equal protection of the laws." A fundamental principle of equal protection is that "like persons in like circumstances will be treated similarly." *Curtis v. Kline,* 542 Pa. 249, 254, 666 A.2d 265, 267 (1995).

The first flaw in UIS' argument is that UIS and Martin Electrical are not similarly situated. UIS was found strictly liable whereas Martin Electrical was found negligent. Based thereon, the trial court molded the verdict to reflect that Mr. Putt's comparative negligence was no defense to UIS' strict liability. *See Kimco Development Corp. v. Michael D's Carpet Outlets,* 536 Pa. 1, 637 A.2d 603 (1993) (negligence concepts do not extend to the area of strict product liability and comparative negligence cannot be asserted as a defense in such an action).

The second flaw in UIS' argument is that the trial court did not order UIS to pay the Putts' share of the delay damages.

Rather, the trial court's molded verdict accurately reflected the jury's actual assessment of UIS' fault, and, therefore, the trial court's order merely mandated that UIS pay its total share of the delay damages. The essence of Rule 238 is to "compensate a plaintiff for the money he would have earned on his award if he had promptly received it." *Costa v. Lauderdale Beach Hotel,* 534 Pa. 154, 158, 626 A.2d 566, 569 (1993) (quotation omitted). An award of delay damages extends the compensatory damages necessary to make a plaintiff whole. *Id.* Such was the case here.[12]

For all of the foregoing reasons, we reverse the trial court's order awarding attorney's fees to Yates. In all other respects, we affirm.

Affirmed in part; Reversed in part.

---

11. U.S. Const. Amend. XIV, § 1.

12. "[W]e have noted that because Rule 238 was promulgated by our Supreme Court, it would be inappropriate for this Court to hold it unconstitutional. Thus, any determination regarding the constitutionality of the Rule can only emanate from the Supreme Court." *Fiorenza v. Kohn,* 396 Pa.Super. 1, 577 A.2d 1384, 1387 (Pa.Super.1990) (citation omitted).