J-S16028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PATRICK YOUNG | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LEON CICCARELLO | : | No. 635 EDA 2023 |

Appeal from the Judgment Entered April 19, 2023
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2021-05203

BEFORE:     STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                          **FILED JULY 15, 2024**

Patrick Young ("Landlord") appeals from the judgment entered against
Leon Ciccarello ("Tenant").  We affirm.

The trial court has filed a thorough thirty-four-page opinion, setting
forth its detailed findings of fact.  We glean the following relevant facts
therefrom.  The parties entered into a residential lease, in which Tenant leased
a house ("the Property") in New Hope, Bucks County, owned by Landlord.[1]
The lease term began on December 1, 2020, and ended on November 30,
2021.  The lease provided for: monthly rent of $7,000; a security deposit of
$14,000; a $50 fee if rent was paid more than five days late or was unpaid;

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Landlord describes the Property as a "luxury" home with an in-ground
swimming pool.  Landlord's Brief at 5.

and an additional charge of ten percent for any month of "holdover rent" if Tenant possessed the property past the end of the lease term. Trial Court Opinion, 5/26/23, at 6. Furthermore, the lease stated: dogs were not permitted on the property; Tenant agreed not to damage any part of the Property; Tenant was responsible for the costs of "repairing any damage that is the fault of Tenant, Tenant's family, guests, and/or guide and support animals;" Landlord "may deduct repair costs and any unpaid rent and additional rent from Tenant's security deposit;" and Landlord or his "representative could enter the Property at reasonable hours to inspect, repair or show the Property," with twenty-four hours' notice, if possible, or without notice in an emergency. *Id*. at 7 (some capitalization omitted).

In May 2021, during the lease term, the parties entered into an agreement of sale, under which Tenant would purchase the Property for $1.53 million. Closing was to be held no later than September 1, 2021, but was delayed. The trial court summarized:

> Because of the delay in the closing date, the parties agreed that [Tenant] would pay a $50,000 . . . non-refundable deposit.[2] Pursuant to the agreement of sale, [Tenant] had seven . . . days to complete a mortgage application. [He] did not submit a completed mortgage application within seven . . . days of signing the agreement of sale and did not obtain a mortgage commitment prior to the closing date of September 1, 2021. [Tenant] refused to close by September 1, 2021. The parties did not close on that

---

[2] Neither the trial court opinion, trial transcript, nor Landlord's brief provides further explanation for this "delay" in closing. Trial Court Opinion, 5/26/23, at 7.

- 2 -

date and [Landlord] retained the $50,000 . . . non-refundable deposit.

*Id*. at 7 (footnote added, record citations and unnecessary capitalization omitted). The parties engaged in a separate lawsuit ("Agreement of Sale Action") relating to this failed sale.[3]

Tenant paid the agreed monthly rent of $7,000 through June 2021. For July 2021, however, he paid only $6,500, claiming he subtracted $500 for a plumbing repair, but failing to provide a receipt despite Landlord's "repeated[]" requests. *Id*. Tenant did not pay the August 2021 rent nor provide an explanation. On August 27, 2021, Tenant's prior counsel, Brian Hanratty, Esquire, advised Landlord that Tenant would pay rent for August and September, with a late fee of $50. *See id*. at 8. On the following day, however, Tenant's new counsel, Brian Newman, Esquire, advised Landlord that: (1) Tenant "was withholding rent payments due to alleged habitability problems with the Property;" and (2) Tenant would not close on the sale of the Property, scheduled for four days later. During the lease term, Tenant did make "reference to some issues with the Property to" Kevin Steiger ("Realtor"), a realtor who represented both parties in connection with the lease. However, Tenant had not communicated any habitability issues to Landlord. *See id*.

---

[3] This matter was captioned *Ciccarello v. Young*, and docketed in the Bucks County Court of Common Pleas at No. 2021-04743. *See* Trial Court Opinion, 5/26/23, at 3.

In August 2021, Landlord advised Tenant he would not renew the lease at the end of the lease term and, furthermore, that due to Tenant's alleged violation of the lease terms, Tenant had fifteen days to vacate the Property or Landlord would initiate a landlord/tenant action. Tenant did not vacate the Property and continued to live there past the expiration of the lease term on November 30, 2021. However, Tenant did not pay any rent from August 2021 onward. Meanwhile, months prior to Tenant's vacating the Property, Landlord requested an inspection of the Property, providing the requisite twenty-four hours notification. Trial Court Opinion, 5/26/23, at 8. Tenant refused entry to Landlord, his handyman, or Realtor.

Tenant returned possession of the Property on January 14, 2022; Tenant's counsel, Landlord, and Realtor were present. Landlord agreed that the Property was "generally broom swept clean in all the rooms." N.T., 9/19/22, at 22. However, whereas "[t]he floors were not scratched when [Tenant] received possession of the Property," they were now scratched. Trial Court Opinion, 5/26/23, at 9. Furthermore, Landlord had learned in May 2021 that dogs were living at the Property, although Landlord did not know that when he leased the Property to Tenant. Landlord did not address this issue with Tenant because they had entered into the agreement for the sale of the Property.

Additionally, Landlord could not locate the remote control for a "custom TV/moving art system," Trial Court Opinion, 5/26/23, at 10, which was a

"piece of art that rolls down over the TV set[.]" N.T., 9/19/22, at 47. Landlord explained that an observer could not initially see a television, "but then you push a button and all of a sudden [the] artwork disappears behind the frame[.]" *Id*. at 46. Because the remote control was missing, "the artwork was stuck . . . in the middle [*sic*]." *Id*. at 47. Landlord indicated that "the guy [*sic*] said remotes are specific to [the systems,] they couldn't provide the remote," and the "whole system" would have to be replaced. *Id*.

Landlord calculated the total unpaid rent, holdover rent, and late fees to be $39,977.42. Furthermore, Landlord advised Tenant he would withhold the $14,000 security deposit to remediate the following alleged damages:

| | |
|---|---|
| Refinishing Hardwood Flooring Damage[d] by Dogs | $ 21,433.00 |
| TV Moving Art System (necessary due to inability [to] Replace custom lost remote control) | $ 10,255.00 |
| Exterior landscaping | $ 1,680.00 |
| Leaf Clean-Up | $ 1,300.00 |
| Insufficient Propane Levels and Key Replacement | $ 758.55 |
| Deep Clean of Interior of Property | $ 500.00 |
| Replacement of Pool Cover Straps and Re-Covering | $ 200.00 |
| Repair of Four (4) Damaged Screens | $1,000.00 (approx.) |

Trial Court Opinion, 5/26/23, at 10. The "figure for the hardwood floors [was] an estimate to sand all the floors [and steps] down." *Id*.; *see also id*. at 22.

In mid-January 2022, soon after Tenant returned possession, Landlord sold the Property to a third party ("Buyer"). The initial agreed upon sale price was $1.6 million, but following an inspection, the amount was reduced by $105,000 to $1.495 million. Landlord did not make any repairs to the hardwood floors or replace the moving art system. The trial court found that

Landlord did make the remaining repairs itemized above and provided receipts. However, for various reasons — not contested on appeal — the trial court awarded damages only for repairs of the window screens, although in the amount of $179. *See id*. at 27 (noting that although Landlord submitted a claim of $1,000 for damaged screens, "he testified at trial that the actual cost . . . was only $179[]").

Landlord filed suit against Tenant in Magisterial District Court and obtained judgment in the amount of $12,213.07. Tenant then appealed to the trial court; he posted security in the amount of $12,000 and subsequently escrowed rent. On October 4, 2021, Landlord filed the underlying complaint in ejectment[4] and breach of contract in the trial court. Landlord sought, *inter alia*, damages for unpaid rent, repairs, cleaning, attorney's fees, costs of suit, and pre- and post-judgment interest. In an answer and new matter, Tenant raised a claim that Landlord breached the implied warranty of habitability.[5]

_____

[4] At the time of this complaint, Tenant was still living in the Property. In March 2022, after Tenant moved out, Landlord filed an amended complaint, withdrawing the claim for ejectment.

[5] *See Pugh v. Holmes*, 405 A.2d 897, 906 (Pa. 1979) (stating that "[t]he implied warranty is designed to insure that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes," and that "to assert a breach of the implied warranty of habitability, a tenant must prove he or she gave notice to the landlord of the defect or condition, that [the landlord] had a reasonable opportunity to make the necessary repairs, and that he failed to do so").

On September 19, 2022, both the Agreement of Sale Action and the instant matter proceeded to separate non-jury trials. First, in the Agreement of Sale Action, the parties sought to admit forty-three joint exhibits, submitted various stipulations of facts, and presented testimony. Immediately thereafter, a non-jury trial was held in the instant matter, wherein the parties agreed to incorporate into the record all the exhibits and stipulations presented in the first trial, and furthermore presented the testimony of Landlord, Tenant, and Realtor. We note no expert witness was presented, with respect to the flooring, the moving art system, or any other physical damages to the Property. The trial court directed the parties to file proposed findings of fact and conclusions of law and deferred ruling.

Post-trial, both parties filed proposed findings of fact and conclusions of law. On December 27, 2022, the trial court issued an order, finding in favor of Landlord and against Tenant on Landlord's breach of contract claim. The trial court also dismissed with prejudice Tenant's counterclaim of breach of the implied warranty of habitability. The court issued detailed findings of facts and conclusions of law. Pertinently, the court found Landlord presented sufficient evidence to support the following damages: (1) unpaid rent from July 2021 to January 2022, totaling $39,977.42; (2) repairs to damaged window screens, totaling $179; and (3) attorney's fees of $9,000. Relevant to this appeal, the trial court found Landlord failed to present sufficient evidence to support damages for the flooring and moving art system.

The trial court calculated Landlord's total damages, including attorney's fees, costs, and pre-judgment interest to be $52,377.86. The court then applied a credit of $40,000, representing: (1) Landlord's retainment of the $14,000 security deposit; (2) the trial court's prior release of a total $19,530 escrow posted by Tenant; and (3) the additional release of $6,470 held by the trial court's prothonotary. The court thus determined the amount of Landlord's judgment to be $12,377.86, plus post-judgment interest at six percent per annum.

Both parties filed post-trial motions, which the trial court denied. Tenant filed a timely appeal and Landlord filed a timely cross-appeal. Both parties and the trial court complied with Pa.R.A.P. 1925. On April 19, 2023, Landlord filed a praecipe to enter judgment in his favor in the amount of $12,377.86, plus post-judgment interest. Tenant's appeal has been dismissed,[6] and we now review Landlord's appeal only.

_____

[6] Initially, this Court *sua sponte* consolidated the two parties' appeals. This Court also granted the application of Tenant's trial attorney to withdraw as counsel. Before any briefs were filed, however, Landlord's attorney filed a suggestion of death, stating that he learned of Tenant's death from Tenant's prior counsel of record. Landlord's attorney averred that despite his best efforts, he could not locate a certification of death, obituary, or other evidence establishing Tenant's death, and furthermore, that a letter to Tenant's wife, who is also the administrator of his estate, was not answered. The trial court has also advised, in response to *per curiam* rules to show cause issued by this Court, that it similarly was unable to ascertain whether Tenant was deceased.

Accordingly, on January 16, 2023, this Court issued an order, which: (1) stated we assume Tenant is **not** deceased; (2) directed the two appeals be
*(Footnote Continued Next Page)*

Landlord raises two issues for our review:

A. Whether the [trial court] erred in finding that an award of [$9,000] represented reasonable attorney's fees owed to [Landlord] following [Tenant's] breach of the lease.

B. Whether the [trial court] erred in failing to award [Landlord] any monetary damages whatsoever to compensate for the physical damage that [Tenant] caused to the [P]roperty in violation of the lease.

Landlord's Brief at 4 (unnecessary capitalization omitted).

In his first issue, Landlord avers the trial court abused its discretion in failing to award a reasonable amount of attorney's fees. We first consider the relevant standard of review:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury, and the findings will not be disturbed on appeal unless predicated upon errors of law or unsupported by competent evidence in the record. Furthermore, our standard review demands that we consider the evidence in a light most favorable to the verdict winner.

*Levitt v. Patrick*, 976 A.2d 581, 588-89 (Pa. Super. 2009) (citation omitted).

With respect to an award of attorney's fees, our appellate review "is limited solely to determining whether the trial court palpably abused its discretion[.] If the record supports a trial court's finding of fact that a litigant

_____

unconsolidated; and (3) further directed that Tenant be designated the appellant in the separate appeal at Superior Court Docket 484 EDA 2023. Tenant's failure to file a brief in his own appeal resulted in the dismissal of that appeal on April 5, 2024. He has not filed a brief in this appeal.

violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal." ***Thunberg v. Strause***, 682 A.2d 295, 299 (Pa. 1996) (citations omitted).

"Although parties to a lawsuit are generally responsible for their own attorney's fees, where one party expressly contracts to pay the other's fees, such an obligation will be enforced." ***Putt v. Yates-American Mach. Co.***, 722 A.2d 217, 226 (Pa. Super. 1998). The Pennsylvania Supreme Court has stated:

> The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was "created" by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

***McMullen v. Kutz***, 985 A.2d 769, 774 (Pa. 2009) (*quoting* ***In re Trust Estate of LaRocca***, 246 A.2d 337, 339 (Pa. 1968) ("***Estate of LaRocca***")). Furthermore, "[t]he amount of counsel fees allowed is within the discretion of the trial court, whose opportunities are necessarily greater for judging the exact amount of labor, skill and responsibility involved as well as the prevailing rate of professional compensation." ***Hart v. Arnold***, 884 A.2d 316, 342-43 (Pa. Super. 2005) (*citing* ***Estate of LaRocca***, 246 A.2d at 340).

It is not disputed that the parties' lease stated that if Tenant breached the lease for any reason, Landlord's remedies may include reasonable attorney's fees and costs, if awarded by a court. Thus, Tenant expressly contracted to pay Landlord's fees attorney's fees and costs. **See Putt**, 722 A.2d at 226. Landlord claims his attorney's fees totaled $24,340. **See** Landlord's Brief at 11.

For ease of discussion, we first set forth the trial court's reasoning for awarding $9,000 in attorney's fees to Landlord. The trial court reviewed each of the **Estate of LaRocca** factors set forth above, as well as the certification of fees submitted by Landlord's attorney, Bryce McGuigan, Esquire. The trial court considered that Attorney McGuigan has been practicing landlord and tenant law in Bucks County since 2014 and charges $275 per hour "for this particular type of work." Trial Court Opinion, 5/26/23, at 19. The trial court found:

> [T]his was a typical landlord/tenant action which commenced in the Magisterial District Court. Indeed, the judgment initially entered was only for $12,213.07. [T]his action was not a matter of particular importance to anyone other than the litigants[, and] did not involve some significant amount of money, complex issues or even extensive pre-trial motion practice (*i.e.*, motions *in limine*). [I]n fact, the trial of this matter only took a few hours. [A]lthough both counsel did a fine job in representing their respective client, this is not the type of action which requires litigation counsel to have some advanced level of experience or specialized skills.

*Id*. (italicization added).

- 11 -

The trial court also considered that the parties were also litigating the Agreement of Sale Action, with Landlord being represented by the same attorney. The court reasoned: "Given the extensive amount of overlap between the two matters, there was great opportunity for efficiency of billing." *Id*. (record citations omitted).

Additionally, the trial court noted Landlord's ability to pay his attorney's fees, and his employment as president of a hospital system in New Jersey. *Id*. The trial court considered that when Tenant was paying rent, Landlord received $7,000 per month. Although Tenant stopped paying rent, "he did make payments into [the trial c]ourt and" in May 2022, the prothonotary released approximately $19,500 to Landlord. *Id*. Finally, the court considered that eight months *before* trial, while this matter was pending, Landlord sold the Property to Buyer for $1.495 million.

On appeal, Landlord challenges each of the trial court's findings under the *Estate of LaRocca* factors and argues the award of $9,000 in attorney's fees was against the weight of the evidence. In support, he presents the following arguments. First, Landlord's commencing this case in the Magisterial District Court did not impact the reasonableness of attorney's fees, and indeed, he was forced to incur more attorney's fees than if he had simply initiated this matter in the trial court. Landlord filed in the Magisterial District Court "to keep costs lower by utilizing the expedited landlord-tenant proceedings," but it was Tenant's filing an appeal to the trial court that

"forced" Landlord to continue litigation. Landlord's Brief at 13. Furthermore, the amount of the Magisterial District Court judgment is irrelevant, as that court's "jurisdictional limit would never have made [Landlord] whole."[7] *Id*.

Second, Landlord disputes the trial court's "subjective" finding that this matter was not complicated nor important. *Id*. at 14. Landlord maintains this "action involved a luxury rental property with monthly rent" of $7,000 and thus was "far more significant and complicated [than a] standard residential eviction." *Id*. Landlord argues Tenant pursued "a legal strategy specifically designed to make" him incur "excessive sums" of attorney's fees. *Id.* at 11. For example, because Tenant refused to allow the release of escrowed rent during the litigation, Landlord had "no choice" but to file a petition to release the funds. *Id*.

Third, Landlord challenges the trial court's reasoning that there was "efficiency" in billing for the two related lawsuits. Landlord's Brief at 14. Landlord maintains he presented twenty-one pages of itemized billing in this matter, which were separate from the legal fees incurred in the Agreement of Sale Action. Landlord also contends that the lease expressly provided for reasonable attorney's fees, while the Agreement of Sale Action included no such contractual attorney's fee provision.

---

[7] Landlord does not explain, however, why he would have been satisfied with such a judgment. Furthermore, we observe that the trial court's total verdict ($52,377.86) was more than four times the Magisterial District Court's judgment ($12,213.07).

Finally, Landlord contends the trial court erred in considering his ability to pay his attorney's fees. He asserts the court "arbitrarily favored a luxury rental tenant [over] a luxury rental landlord, despite the fact that [Tenant] readily paid $7,000[] monthly rent until he decided to stop" when the parties' sale agreement "collapsed." *Id*. at 15-16. Landlord maintains that Tenant did not challenge, and the trial court did not reject, Landlord's attorney's rate of $275 per hour, and Landlord provided detailed billing for the court's review. Landlord concludes the $9,000 attorney's fees award does not fairly compensate him for a rental dispute that spanned eighteen months "through multiple courts." *Id*. at 16. He claims the $9,000 amount represents fewer than thirty-three billable hours, which, across eight months, would correspond to less than two hours' legal work per month.

We construe Landlord's arguments to be an appeal to this Court to reweigh the evidence in his favor and supplant the trial court's weight of the evidence determinations with our own. This we cannot do, as the trial court's findings, on appeal, must be given the same deference as a jury verdict. *See Levitt*, 976 A.2d at 588-89. We conclude the trial court properly and thoroughly reviewed each of the *Estate of LaRocca* factors. The court considered: Attorney McGuigan's experience in this area of the law, his usual hourly rate, the straightforwardness of the litigation; and the lack of any impact this matter would have on the law or the public in general, notwithstanding the higher amount of monthly rent involved. *See McMullen*,

985 A.2d at 774. Furthermore, **Estate of LaRocca** does allow consideration of a client's ability to pay reasonable fees for his attorney's services, and here, the trial court considered Landlord's employment as president of a hospital system, his receipt of escrowed funds from Tenant during the litigation, and his ability to sell the Property, also during the litigation, for $1.495 million. **See id**.

After review of the trial evidence and testimony, the trial court's detailed findings of fact and conclusions of law, and Landlord's arguments, we conclude the trial court did not commit an error of law, and the record supports the court's determination that $9,000 was a reasonable attorney's fees award. **See Thunberg**, 682 A.2d at 299. Because the record evidence supports the trial court's reasoning, we may not reweigh the evidence and disturb the trial court's findings of fact. Thus, no relief is due on Landlord's first issue.

In his second issue, Landlord avers the trial court abused its discretion in failing to award "any" damages for physical damage to the Property.[8] Landlord's Brief at 16. We reiterate that a trial court's findings "in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury," and we will not disturb the court's findings unless they are "predicated upon errors of law or unsupported by competent evidence in the record." **Levitt**, 976 A.2d at 588-89. "The factfinder is free to believe all, part, or none

_____

[8] As noted above, the trial court did award $179 in damages for the damaged window screens. **See** Trial Court Opinion, 5/26/23, at 27.

of the evidence and to determine the credibility of the witnesses." ***Spencer v. Johnson***, 249 A.3d 529, 566 (Pa. Super. 2021) (citation omitted); ***see also Neison v. Hines***, 653 A.2d 634, 637 (Pa. 1995) (stating "the jury is free to believe all, some, or none of the testimony presented by a witness").

For ease of discussion, we again first set forth the trial court's reasoning for denying Landlord damages for the alleged damage to the hardwood floors and the custom moving art system. First, with respect to hardwood flooring, the trial court considered: the flooring "was already 10-12 years old;" it was not disputed that Landlord's prior tenant had a pet, who also caused damage to the floors, but Landlord required the prior tenant to pay only for repairs to the damaged section of the floor, and not the entire first floor as well as the steps; Landlord's $21,433 figure was "merely an estimate;" the estimate included repairs that went "beyond" sanding and refinishing, and included "installing molding, 'work to Viking stove,' 'R/R wine refrigerator,' [and] 'work to covered molding;'" but the estimate did not include any breakdown of the work. Trial Court Opinion, 5/26/23, at 22. Finally, the court considered that Landlord did not present any expert testimony to support a claim that the only way to repair the scratches, allegedly caused by Tenant's dog, was to sand and refinish the entirety of the first floor and the steps.

With respect to the moving art system, the trial court similarly found that Landlord failed to introduce any expert testimony to support his claim "that the remote control could not be replaced[,] and that the only way to

repair the situation [was] to replace the moving art system in its entirety." *Id*. at 23 (capitalization removed). Additionally, the trial court considered that although the custom TV/moving art system was installed twelve years earlier, "the only evidence [Landlord] submitted regarding its value was an estimate to replace the system with a **new**" system. *Id*.

Finally, the trial court considered that it was undisputed Landlord "never actually had any work to the flooring completed before he sold the Property to Buyer." Trial Court Opinion, 5/26/23, at 22. The trial court found that Landlord failed to present evidence that the state of the floor or the moving art system "actually caused him to suffer any financial harm[,] given his almost immediate sale of the Property" for an initial sale price of $1.6 million — $70,000 more than the amount in his Agreement of Sale with Tenant. *Id*. at 23. The trial court acknowledged Landlord's testimony that he ultimately sold the Property for $1.495 million "[d]ue to the condition of the Property," but the court observed there was **no** evidence, aside from Landlord's uncorroborated testimony, showing the $105,000 reduction in sale price was related to the flooring or the moving art system. *Id*. at 24. To this end, the trial court pointed out, Buyer did not testify at trial. Furthermore, Landlord conceded that Buyer's inspection report: (1) made no mention of the flooring, the missing remote control, or the moving art system; but instead (2) referred to "some concern with some of the stucco" and an issue with the fireplace. *Id*. at 25. In sum, the trial court determined that Landlord failed

to meet his burden of proving that the condition of the flooring or the moving art system caused him to suffer any financial harm or the $105,000 reduction in his sale price to Buyer.

On appeal, Landlord challenges each of the trial court's findings, alleging the court "misread the evidence" and ignored its own findings of fact. Landlord's Brief at 16. In support, Landlord cites: the photographs he presented, which showed damage to the hardwood floors and moving art system; Realtor's testimony that both were in undamaged, working condition at the start of Tenant's lease; and the trial court's own finding that the floors were not scratched when Tenant began the lease, but the floors were scratched when Tenant moved out. Landlord also disputes the trial court's reasoning that he had failed to show the necessity of restoring the entire first floor. Landlord maintains he did present photographs showing the entire first floor, more than 3,000 square feet, had a "continuous hardwood floor that spanned multiple rooms" and had "scratches and scrapes throughout various portions." *Id*. at 18. Landlord testified "it would not be possible to sand and refinish only certain areas of the floors, but that the entire first floor would need to be treated [to] maintain its uniform appearance." *Id*. Landlord also asserts that the trial court "misread" the estimate as including unrelated items. *Id.* at 19. Instead, Landlord explains, the estimate was based on "the need to remove and replace ('R/R') a wine refrigerator[,] certain molding and

cabinets," while other features, such as curved molding and a Viking stove, would not be removed. *Id*. at 18-19.

Landlord also challenges the trial court's denial of damages for Tenant's refusal to return the remote control for the moving art system. *Id*. at 19. Landlord maintains that although this custom system, "made exclusively for the Property," was functional, as a result of the loss of the "crucial" remote control, "the entire system needed to be replaced." *Id.* at 19-20. Landlord argues there was no challenge to the $10,255 amount to replace the system.

Finally, Landlord contends that the eventual of sale of the Property, without performing the repairs to the flooring and moving art system, is irrelevant. Landlord insists he "sustained financial harm as a result of [Tenant's] conduct," where the initial sale price was $1.6 million but was reduced by $105,000 following an inspection. Landlord's Brief at 20-21. Landlord argues:

> This reduction in price was due to a variety of factors, [including] items revealed in the inspection report, together with "general wear and tear on the home." [Landlord] confirmed[, and Realtor corroborated,] that the need for the new [B]uyer to address the flooring and the television was a factor in . . . such a large . . . reduction in price."

*Id*. at 21 (record citation omitted). Finally, Landlord argues that to the extent the trial court considered Tenant's prior proposed purchase price, Landlord "still received $35,000[] less than he would have . . . received from" Tenant. *Id.* at 21.

We again discern Landlord's various arguments to be an appeal to this Court to reweigh the evidence in his favor. We cannot do so, as the trial court was free to believe all, part, or none of the evidence, including Landlord's testimony, and the court's weight of the evidence determinations are binding on this Court. *See Spencer*, 249 A.3d at 566; *see also Levitt*, 976 A.2d at 588-89. Landlord does not address, let alone dispute, the court's reasoning that he did not present any expert testimony as to the nature and cost of repairing the floor and the moving art system, nor as to the value of these items. Instead, Landlord reiterates what his own trial testimony was and avers the trial court erred in not accepting it. Notwithstanding Landlord's contentions that the trial court misunderstood the details of the repairs — for example whether it was necessary to move the molding or appliances[9] — we hold that that the trial court was free to consider Landlord's testimony against the contents of Buyer's inspection report, and to determine that without any corroborating evidence, Landlord's testimony, alone, was insufficient to show that the $105,000 reduction in the Buyer's sale price was directly caused by the damage to the flooring or the moving art system. *See Spencer*, 249 A.3d at 566. After careful review of the record, the trial court's opinion, and Landlord's comprehensive arguments, we determine the trial court's findings

_____

[9] We offer no opinion as to whether the trial court misinterpreted these details of the repair estimate, as it does not affect our disposition.

- 20 -

are supported by the record.  We therefore conclude that no relief is due on Landlord's second issue, challenging the weight of the evidence.

As we find no basis to grant relief on Landlord's claims, we affirm the judgment entered in his favor.

Judgment affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/15/2024